# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE CBS CORPORATION | ) | **CONSOLIDATED** |
| STOCKHOLDER CLASS ACTION | ) | **C.A. No. 2020-0111-JRS** |
| AND DERIVATIVE LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: September 17, 2020
Date Decided: January 27, 2021

Michael Hanrahan, Esquire, Corinne Elise Amato, Esquire, Eric J. Juray, Esquire and Xi (Elizabeth) Wang, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Michael J. Barry, Esquire, Christine M. Mackintosh, Esquire, John C. Kairis, Esquire and Rebecca A. Musarra, Esquire of Grant & Eisenhofer, P.A., Wilmington, Delaware; and Eric L. Zagar, Esquire and Grant D. Goodhart, III, Esquire, of Kessler Topaz Meltzer & Check, LLC, Radnor, Pennsylvania, Attorneys for Plaintiffs.

Jeremy D. Anderson, Esquire of Fish & Richardson P.C., Wilmington, Delaware; and Gustavo F. Bruckner, Esquire and Samuel J. Adams, Esquire of Pomerantz LLP, New York, New York, Attorneys for Executive Committee of Additional Counsel for Plaintiffs.

Matthew E. Fischer, Esquire, Michael A. Pittenger, Esquire, Christopher N. Kelly, Esquire, J. Matthew Belger, Esquire, Jacqueline A. Rogers, Esquire and Callan R. Jackson, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Victor L. Hou, Esquire, Rahul Mukhi, Esquire and Mark E. McDonald, Esquire of Cleary Gottlieb Steen & Hamilton LLP, New York, New York, Attorneys for Defendants National Amusements, Inc., Sumner M. Redstone National Amusements Trust, and Shari E. Redstone, also Attorneys for Defendant Robert N. Klieger.

Daniel A. Mason, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware and Brad S. Karp, Esquire, Bruce Birenboim, Esquire, Jaren Janghorbani, Esquire and Alexia D. Korberg, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendants Candace K. Beinecke, Barbara M. Byrne, Gary L. Countryman, Brian Goldner, Linda M. Griego, Martha L. Minow, Susan Schuman, Frederick O. Terrell and Strauss Zelnick.

Robert A. Penza, Esquire and Christina B. Vavala, Esquire of Polsinelli PC, Wilmington, Delaware and Kevin T. Abikoff, Esquire, Benjamin Britz, Esquire, Stephen R. Halpin III, Esquire and Robby S. Naoufal, Esquire of Hughes Hubbard & Reed LLP, Washington, DC, Attorneys for Defendant Joseph Ianniello.

Elena C. Norman, Esquire and Daniel M. Kirshenbaum, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Jonathan K. Youngwood, Esquire, Linton Mann III, Esquire and Sarah L. Eichenberger, Esquire of Simpson Thacher & Bartlett LLP, New York, New York, Attorneys for Nominal Defendant ViacomCBS Inc.

**SLIGHTS, Vice Chancellor**

The Beach Boys, in their original form, were quintessentially an "American Band."[1]  Their profound and lasting impact on American culture was recognized yet again in the fall of 2020, when Rolling Stone magazine named their seminal album, *Pet Sounds*, the second Greatest Album of All Time (of any genre).[2]  Almost exactly four years earlier, in the fall of 2016, Rolling Stone contributing editor, Rob Sheffield, wrote a review of two memoirs, released weeks apart, from Brian Wilson and Mike Love, either or both of whom (depending upon who you ask) are regarded as the creative force(s) that drove the band to its iconic status.[3]  In his review, Sheffield observed that while Wilson and Love were in the same band, and presumably shared the same band experiences, their recounting of those experiences, colored by vastly different and, in some respects, antagonistic perspectives, was remarkably different.  According to Sheffield, this dynamic resulted in "very different takes on the Beach Boys story."[4]

This Court recently considered the story of the well-publicized merger of Viacom, Inc. and CBS Corporation, two quintessentially American companies, as

---

[1] *The Beach Boys: An American Band* (High Ridge Productions, 1985).

[2] The 500 Greatest Albums of All Time, *Rolling Stone* (Issue 1344, Oct. 2020).

[3] Rob Sheffield, Heroes and Villains, *Rolling Stone* (Issue 1271, Oct. 2016).

[4] *Id.*

told from the perspective of displeased Viacom stockholders.[5] The story was presented in a putative class action complaint where Viacom stockholders alleged the Viacom/CBS merger was the product of actionable breaches of fiduciary duty by Viacom fiduciaries and patently unfair. The Court found the allegations were well-pled and denied motions to dismiss the complaint.[6]

In a rare, but not unheard of twist, the Court must consider the same story, the story of the Viacom/CBS merger, but this time as told from the perspective of displeased CBS stockholders who allege the merger was unfair to them and the product of actionable breaches of fiduciary duty by CBS fiduciaries. Like Wilson and Love, the CBS and Viacom stockholders offer very different takes on the same sensational story.

As pled in a complaint comprising 267 paragraphs, Plaintiffs' take is this: After Shari Redstone ("Ms. Redstone") consolidated control of both CBS and Viacom under her holding companies, defined collectively below as the NAI Parties, she thrice attempted to merge Viacom and CBS and twice was turned back by the

---

[5] *See In re Viacom, Inc. S'holders Litig.*, 2020 WL 7711128 (Del. Ch. Dec. 29, 2020, revised Dec. 30, 2020).

[6] *Id.*

CBS board of directors (the "CBS Board"). The third try proved to be the charm, resulting in a merger (the "Merger") that spawned nominal Defendant, ViacomCBS.

From Plaintiffs' perspective, it is necessary to understand the history of Ms. Redstone's failed efforts to cause Viacom and CBS to merge in order fully to appreciate the breaches of fiduciary duties within CBS that led to the consummated Merger. By the time Ms. Redstone first attempted to cause a Viacom/CBS merger in September 2016, she had already packed the Viacom board of directors ("Viacom Board") with loyalists. The CBS Board, still independent at the time, opposed the merger for several reasons, including that the NAI Parties would not agree to allow CBS's minority stockholders to approve the merger, would not consider any merger partner other than Viacom and would not agree to allow a combined Viacom/CBS to be managed free of the NAI Parties' control. Most troubling to the CBS Board, however, was that the NAI Parties were attempting to thrust a floundering Viacom upon a thriving CBS in hopes that the combination would enhance the value of the NAI Parties as controlling stockholders of both companies. With the CBS Board unwilling to negotiate, Ms. Redstone's first attempt to cause a merger failed.

Ms. Redstone was distressed but not deterred. Behind the scenes, she shared with confidantes her concern that Viacom might not make it as a going concern without a Viacom/CBS combination. In a more public display of frustration, she

threatened the CBS Board with retribution and pledged "the merger would get done 'even if [she had] to use a different process.'"[7] She then emailed a trusted Viacom director seeking recommendations for CBS board nominees "whose loyalty to [NAI] I can trust."[8]

In January 2018, advisors warned Ms. Redstone that, absent a Viacom/CBS merger, the NAI Parties may be left with a portfolio of assets burdened by Viacom's underperformance and unattractive to suitors. Less than one month later, in February 2018, Ms. Redstone returned to the boards of the two companies she controlled with directions that they again form special committees to consider a merger. And, once again, Ms. Redstone made clear that the NAI Parties would not agree to consider alternative transactions or to subject a Viacom/CBS merger to a majority-of-the-minority vote condition.

This time the CBS Board, through its special committee, determined that Ms. Redstone was likely to force a merger over the CBS Board's objection and that the NAI Parties "presented a significant threat of irreparable and irreversible harm to the Company and its stockholders" because they were seeking "to combine CBS

---

[7] Verified Consol. Class Action and Deriv. Compl. ("Compl.") ¶ 53 (Docket Item ("D.I.") 38). The Complaint integrates facts from documents produced by CBS to Plaintiffs under 8 *Del. C.* § 220 ("Section 220 Documents"); citations to those documents are to "CBS ___."

[8] Compl. ¶ 31 (quoting CBS 00004214).

4

and Viacom regardless of the strategic and economic merits of the transaction."[9] To protect CBS stockholders, the independent members of the CBS Board took measures this Court has previously described as "extraordinary"; they devised a special dividend that would dilute the NAI Parties' voting control of CBS from 80% to 17%,[10] and then filed preemptive litigation against the NAI Parties in this Court where they sought a declaration that the dividend was valid and asserted breach of fiduciary duty claims against the NAI Parties. CBS executives, including then-Chief Operating Officer Joseph Ianniello, supported the independent board's effort to oust their controller.

In riposte, the NAI Parties countersued alleging the special dividend was unlawful as a matter of statute and the product of breaches of fiduciary duty by members of the CBS Board who were acting for the sake of entrenchment. The litigation that followed was expedited and intense.

That litigation ultimately settled in September 2018 (the "2018 Settlement"), resulting in the resignation of seven CBS directors and the addition of six new directors hand-picked by Ms. Redstone. Key governance committees were

---

[9] Compl. ¶ 67.

[10] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *2 (Del. Ch. May 17, 2018).

restructured to include Redstone-backed candidates. Ianniello was named interim CEO and President after he assured Ms. Redstone that he now understood the wisdom of a Viacom/CBS combination. But there was a problem: to achieve a settlement and cement her control over the CBS Board, Ms. Redstone had to agree that, in the two years following the settlement, the NAI Parties would not "directly or indirectly" propose a Viacom/CBS merger "unless at least two-thirds (2/3) of the directors who were not affiliated with [the NAI Parties] proposed one or asked for a proposal."[11]

Notwithstanding this contractual commitment, just four months after the 2018 Settlement, Ms. Redstone was back at it again attempting to promote a Viacom/CBS merger with the boards of both companies. At CBS, she cajoled the newly constituted CBS Board to form a special committee to evaluate the merger while sidelining carry-over directors who formerly opposed her. She attended meetings of CBS Board committees that, per the 2018 Settlement, should have met free of her influence. And she worked to impose her preferred terms on the deal with the aid of her new ally, Ianniello, whom she incentivized to do her bidding with a rich pre- and post-merger compensation package.

---

[11] Compl. ¶ 82.

6

The newly installed CBS directors acceded to Ms. Redstone's will at every turn. At her direction, they approved Ianniello's amended employment agreement, increasing his guaranteed compensation despite knowing CBS would receive nothing by way of services in return. They did nothing to seek protection for CBS's minority stockholders, such pushing for a majority-of-the-minority vote condition or insisting upon a CBS-led management team for the combined company, even though past CBS boards had deemed such protections to be *sine qua non* for a Viacom/CBS combination. The result—multiple breaches of fiduciary duty that facilitated a merger that was beneficial to the NAI Parties, as Viacom and CBS's controlling stockholders, but demonstrably unfair to the CBS minority stockholders.[12]

With the benefit of documents secured after prevailing in expedited Section 220 litigation against CBS prior to the Merger,[13] Plaintiffs bring breach of fiduciary duty claims against the NAI Parties, members of the CBS Board and Ianniello (collectively, "Defendants") for their role in consummating the Merger,

---

[12] The stories of the Viacom/CBS merger, as told by both Viacom and CBS stockholders in their respective complaints, read like something out of a George R.R. Martin novel. Their competing claims of unfairness call to mind the author's reference to the adage: "A fair bargain leaves both sides unhappy." GEORGE R.R. MARTIN, A DANCE WITH DRAGONS (HarperCollins 2011). Whether the adage proves true here remains to be seen.

[13] *Bucks Cty. Emps. Ret. Fund v. CBS Corp.*, 2019 WL 6311106 (Del. Ch. Nov. 25, 2019) (the "220 Op.").

disseminating a misleading proxy statement and approving Ianniello's compensation agreement.

Each defendant has moved to dismiss the complaint, arguing Plaintiffs have asserted derivative claims belonging to CBS and yet have failed to plead that demand on the CBS Board would have been futile. As for the viability of the claims, Defendants maintain that Plaintiffs' breach of fiduciary duty claims related to the Merger must be evaluated under the deferential business judgment rule because Plaintiffs have failed to well plead that the NAI Parties, as controller, derived any benefit from the Merger not shared with CBS's other stockholders and have failed to well plead that the CBS Board was otherwise conflicted. Even if entire fairness review applies, however, Defendants argue that Plaintiffs fail to state a claim that the Merger was unfair or, as to members of the CBS Board, to plead non-exculpated claims upon which relief can be granted.

For reasons explained below, in large measure, Defendants' motions to dismiss must be denied. At the threshold, I dismiss Plaintiffs' disclosure claim, where they allege that the CBS Board's misleading disclosures caused CBS stockholders to hold rather than sell their stock in advance of the Merger, because so-called "holder" claims cannot be brought as class claims as a matter of Delaware law. As to the individual holder claim stated by Plaintiffs, even if I assume (without

8

deciding) that Delaware recognizes such claims, Plaintiffs have not adequately pled the elements of the claim here.

Beyond the holder claim, however, Defendants' motions to dismiss must be denied. Even assuming Plaintiffs have pled derivative rather than direct claims, a point they dispute, Plaintiffs have adequately pled demand futility because a majority of the members of the CBS Board that would have considered a demand face a substantial likelihood of liability for the non-exculpated breach of their fiduciary duty of loyalty in negotiating the Merger and facilitating Ms. Redstone's *quid pro quo* with Ianniello. Because the pleading standard under Chancery Rule 23.1 is more demanding than the standard imposed by Chancery Rule 12(b)(6), it follows that the motion to dismiss the claims against these same CBS Board members for failure to state viable claims must also be denied. As for the claims relating to Ianniello's Merger-related compensation package, Plaintiffs have well pled that the then-extant CBS Board and Iannielo breached their fiduciary duties by approving and accepting, respectively, the compensation for the purpose of furthering the controller's interests to the detriment of CBS and its minority stockholders.

The Complaint also well pleads a breach of fiduciary duty by the NAI Parties. While Delaware law provides controllers a pathway to attain deferential pleading-stage business judgment review of a transaction through the *MFW* framework, the

NAI Parties expressly declined to condition the Merger on a majority-of-the-minority vote.[14] And Plaintiffs have well pled the NAI Parties were conflicted controllers by virtue of standing on both sides of the Merger and extracting from the Merger a benefit not shared ratably by CBS Class B stockholders (the enhancement of value within the NAI Parties by saving the failing Viacom through the Merger). Because Plaintiffs have pled facts that allow a reasonable inference the Merger was not entirely fair to CBS's minority stockholders, the motion to dismiss the claims against the NAI Parties must also be denied.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Amended Complaint and documents properly incorporated by reference or integral to that

---

[14] *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) ("*MFW*") (holding that breach of fiduciary duty claims arising out of a squeeze-out merger conditioned from the outset upon both the negotiation and approval of a fully empowered independent special committee of the board *and* the uncoerced, fully informed vote of a majority of the minority stockholders in support of the transaction will be reviewed under the business judgment rule), *overruled in part*, *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *Flood*, 195 A.3d at 770 (affirming trial court dismissal of a complaint under Chancery Rule 12(b)(6) where defendants had clearly complied with the *MFW* dual protections); *In re Martha Stewart Living Omnimedia, Inc., S'holder Litig.*, 2017 WL 3568089, at *18 (Del. Ch. Aug. 18, 2017) (describing the dual-protections laid out in *MFW* as a "road map" for fiduciaries to earn pleading-stage business judgment review of their conduct in approving transactions with conflicted controllers).

10

pleading.[15]  For purposes of the motion only, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[16]

## A. The Parties and Relevant Non-Parties

Nominal Defendant, ViacomCBS, is a publicly traded Delaware corporation with its principal place of business in New York, New York.[17]  ViacomCBS is the entity formed as a result of the Merger of Viacom and CBS in 2019.[18]  Its common stock is divided into two classes: Class A voting stock, which has one vote per share, and Class B non-voting stock, which has economic rights but no voting rights.[19]  Both classes of stock trade on the NASDAQ.[20]

---

[15] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint); *In re Clovis Oncology*, *Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. 2019) (discussing the limitations of the "incorporation by reference" and "integral to the complaint" doctrines).  I address the limitations of these pleading doctrines in more detail below.

[16] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[17] Compl. ¶ 11.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Defendant, Ms. Redstone, is a director and Chair of ViacomCBS.[21] Prior to the Merger, she was Vice Chair of the CBS Board and Vice Chair of the Viacom Board.[22] Ms. Redstone controls ViacomCBS through National Amusements, Inc. ("NAI").[23]

Defendant, NAI, is a closely held Maryland corporation headquartered in Massachusetts.[24] NAI currently owns 79.8% of ViacomCBS's one-vote Class A common stock.[25] NAI's ViacomCBS stock is held and beneficially owned through NAI and NAI Entertainment Holdings, LLC ("Holdings"),[26] and NAI owns all of the membership interests in Holdings.[27] NAI has been effectively controlled by Ms. Redstone, through the Sumner M. Redstone National Amusements Trust ("SMR Trust") and the Shari E. Redstone Trust, since her father, Sumner Redstone, experienced declining health in 2014 and subsequently passed.[28]

---

[21] Compl. ¶ 12.

[22] *Id.*

[23] Compl. ¶¶ 12–14.

[24] Compl. ¶ 13.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Compl. ¶¶ 13, 41.

Defendant, SMR Trust, is a Massachusetts-based trust that holds approximately 80% of the common stock of NAI.[29] Ms. Redstone became a trustee of the SMR Trust upon Sumner Redstone's death.[30] Thus, Ms. Redstone now effectively controls the SMR Trust, NAI and Holdings (together with Ms. Redstone, the "NAI Parties").[31]

The "Director Defendants," named below, consist of ten individuals (excluding Ms. Redstone) who served as CBS Board members at the time of the Merger.[32] They are Candice K. Beinecke, Barbara M. Byrne, Gary L. Countryman, Brian Goldner, Linda M. Griego, Robert Klieger, Martha L. Minow, Susan Schuman, Frederick O. Terrell and Strauss Zelnick.[33] Defendants, Beinecke, Byrne, Countryman, Goldner, Griego, Minow, Schuman and Terrell served as members of the special committee of the CBS Board that negotiated and approved the Merger

---

[29] Compl. ¶ 14. Ms. Redstone owns the remaining 20% voting interest in NAI not controlled by the SMR Trust through her own trust. Compl. ¶ 13.

[30] Compl. ¶ 14.

[31] *Id.*

[32] Compl. ¶¶ 15–25.

[33] Compl. ¶¶ 15–24.

(the "CBS Committee").[34]  Ms. Redstone, Klieger and Zelnick abstained from the CBS Board's vote to approve the Merger.[35]

Defendant, Joseph Ianniello, served as President and Acting CEO of CBS from September 2018 until the ViacomCBS merger, having previously served as CBS's Chief Operating Officer and Chief Financial Officer since 2009.[36]  In April 2019, Ianniello's employment agreement was amended, resulting in an increase of base salary from $2.5 million to $3 million, a guaranteed cash bonus for 2019 of $15 million (up from a potential of $12 million) and an immediate, lump sum payment of $5 million.[37]  After the Merger closed in December 2019, Ianniello left ViacomCBS the following month, at which time he was owed approximately $79 million in cash compensation.[38]

Co-Lead Plaintiffs, Bucks County Employees Retirement Fund and International Union of Operating Engineers of Eastern Pennsylvania and Delaware

---

[34] Compl. ¶ 25.

[35] *Id.*

[36] Compl. ¶ 26.

[37] *Id.*

[38] *Id.*

(collectively "Plaintiffs"), were, at all relevant times, beneficial owners of CBS Class B Common Stock.[39]

Relevant non-parties who currently sit on the ViacomCBS board, and did so at the time the Complaint was filed (the "Demand Board"), include: Judith A. McHale, who was a member of the Viacom special committees in 2016, 2018 and 2019, and voted in favor of the Merger as a Viacom director; Ronald L. Nelson, who was appointed to the Viacom Board by NAI through written consent in 2016 and voted in favor of the Merger as a Viacom director; Charles E. Phillips, who joined the Viacom Board in 2006 and voted in favor of the Merger as a Viacom director; Nicole Seligman, who was appointed to the Viacom Board by NAI through written consent in 2016 and voted in favor of the Merger as a Viacom director; and Robert Bakish, who has worked for Viacom in various roles since 1997 and is now a director and CEO of ViacomCBS.[40]

---

[39] Compl. ¶ 13.

[40] Compl. ¶¶ 27–32.

## B. The Redstones Take Control of Viacom and CBS

In 1987, Sumner Redstone ("Mr. Redstone") acquired, through NAI, a controlling interest in Viacom.[41] Under his control, Viacom acquired CBS in 1999.[42] After operating CBS under the Viacom umbrella for six years, the Viacom Board approved a plan that spun CBS off as an independent operating company.[43] When CBS and Viacom separated, each company maintained dual-class structures of Class A voting stock and Class B non-voting stock: NAI owned approximately 80% of the Class A stock (and voting control) of both Viacom and CBS, while holding only ~10% of the economic interest (i.e. economic risk) in both companies.[44]

Mr. Redstone practiced good corporate governance throughout his tenure as controller and Chairman of both CBS and Viacom.[45] He publicly declared that the CBS Board would remain independent from NAI's control, installing protections in CBS's constitutive documents that required the CBS Board to be comprised of a

---

[41] Compl. ¶ 34.

[42] *Id.*

[43] *Id.*

[44] Compl ¶ 35.

[45] Compl. ¶ 36.

majority of independent directors and ensured that only independent directors could serve on CBS's compensation and governance committees.[46]

While Mr. Redstone allowed his daughter, Ms. Redstone, to hold positions in NAI and Viacom as early as 1993, he always considered Philippe Dauman to be his natural successor and the future Viacom CEO.[47]   But Ms. Redstone saw things differently.  As she stated in a May, 2004 article in the *New York Times*: "It was always my intention that when the kids were grown, I would spend more time and play a more significant role at Viacom."[48]   Given her father's preference for Dauman, Ms. Redstone acknowledged that she likely "would have to one day sue Dauman to protect her family's empire."[49]

In 2014, Mr. Redstone's health began to decline, and his daughter sought to become his healthcare agent.[50]   In December 2015, Ms. Redstone executed documents that allowed her to participate in Mr. Redstone's healthcare decisions.[51] By early 2016, Mr. Redstone's ill health forced him to relinquish his chairmanship

---

[46] Compl. ¶ 37.

[47] Compl. ¶ 39.

[48] *Id.*

[49] *Id.*

[50] Compl. ¶ 41.

[51] *Id.*

17

of CBS and Viacom.[52]  Each board filled the position with its respective CEO.[53]  For Viacom, that meant Dauman, and Ms. Redstone was the only Viacom Board member to vote against the appointment.[54]

Around the same time, Ms. Redstone began to alter the composition of the trustees for the SMR Trust and the Viacom Board.[55]  She replaced two long-time SMR trustees with NAI's general counsel and a "close friend."[56]  She then removed Dauman and another director from the NAI Board, replacing them with her children.[57]  Ms. Redstone's aggressive governance restructuring secured her majority control of the NAI Board and thus voting control of CBS and Viacom.[58]

With NAI under Ms. Redstone's control, she turned her attention to Viacom and Mr. Redstone's heir apparent, Dauman.  She began by halting Dauman's plan to sell Viacom's minority stake in its film studio subsidiary, Paramount,[59] threatening

---

[52] Compl. ¶ 42.

[53] *Id.*

[54] *Id.*

[55] Compl. ¶ 43.

[56] *Id.*

[57] Compl. ¶ 44.

[58] Compl. ¶ 43.

[59] Compl. ¶ 44.

to remove Viacom directors who did not support her vision for the company.[60] In June 2016, Ms. Redstone, through NAI, caused an amendment to Viacom's bylaws that granted NAI veto authority over key business decisions and the authority unilaterally to replace board members.[61] Ten days later, NAI delivered written consents removing five members of the Viacom Board and replacing them with Seligman, Nelson, McHale, Thomas May and Kenneth Lerer.[62] Together with Shari and Sumner Redstone, NAI's newly appointed directors comprised a majority of Viacom's eleven-member Board.[63]

The ousted Viacom Board members sued NAI and Ms. Redstone, accusing Ms. Redstone of "playing puppet master behind [an] invalid removal attempt."[64] In August 2016, the litigation was settled, Dauman agreed to step down for "good reason," and Viacom agreed to pay him $72 million.[65] The NAI-controlled Viacom

---

[60] *Id.*

[61] Compl. ¶ 45.

[62] *Id.*

[63] *Id.*

[64] Compl. ¶ 46 (quoting *Salerno v. Nat'l Amusements, Inc.*, C.A. No. 12473-CB (Del. Ch. June 16, 2016), Verified Compl. Pursuant to 8 *Del. C.* § 225(a) (D.I. 1) ¶ 77).

[65] Compl. ¶ 47.

Board appointed Bakish as Viacom's President and CEO.[66] The bylaw amendments adopted through NAI's written consents were upheld, and NAI's newly appointed directors remained in their positions.[67] The August 2016 settlement secured Ms. Redstone's majority control of the NAI Board, operational and voting control of Viacom and voting control of CBS.[68]

## C. The First Merger Attempt

With Ms. Redstone in charge, in September 2016, the NAI Parties proposed a Viacom/CBS merger to the Viacom Board.[69] In response, the Viacom Board formed a special committee comprised mostly of directors recently installed by Ms. Redstone.[70] The CBS Board, at this point still independent of NAI, formed its own special committee.[71] Ms. Redstone informed the CBS special committee that the NAI Parties would not consider any alternative to a Viacom/CBS combination

---

[66] Compl. ¶¶ 44–46.

[67] *Id.*

[68] Compl. ¶ 49.

[69] Compl. ¶¶ 46, 50.

[70] Compl. ¶ 50.

[71] *Id.*

and would not allow any alternative to be put to a vote of public stockholders.[72] She also refused to accede to CBS's demand that a combined Viacom/CBS be managed as a non-controlled company for at least five years.[73]

The first merger proposal came at a time when, as NAI conceded, Viacom was "tremendously underperforming"[74] and was "(correctly) viewed as a troubled company."[75] The CBS special committee advised NAI's counsel that the transaction would not go forward "unless [the independent directors of CBS] are satisfied that the [CBS] CEO and management team . . . would have complete operating and strategic authority going forward."[76] In this regard, the CBS Board members believed it was their "fiduciary duty to ensure, as a threshold matter, that the management and structure that have produced the great [CBS] success would not be diluted or lost in a potential combination with Viacom."[77] When it became clear that NAI was not prepared to negotiate on these governance terms, the CBS special

---

[72] Compl. ¶ 51. True to her word, Ms. Redstone unilaterally turned away AT&T's chief executive after he expressed interest in acquiring CBS. *Id.*

[73] Compl. ¶ 52.

[74] *CBS Corp. v. Nat'l Amusements, Inc.*, C.A. No. 2018-0342-AGB, at 58 (Del. Ch. May 16, 2018) (TRANSCRIPT) (D.I. 49) (the "May 16, 2018 Tr.").

[75] Compl. ¶ 54 (quoting CBS 000005827).

[76] *Id.* (quoting CBS 00005248–49).

[77] *Id.* (quoting CBS 000005249).

committee broke off discussions in December 2016, just two months after the merger was first proposed.[78]

## D. Ms. Redstone Expresses Concern for Viacom

Ms. Redstone was not pleased. She declared that "the failure to get the deal done had caused Viacom to suffer," and threatened that "the merger would get done 'even if [she had] to use a different process.'"[79] She lamented to Klieger (who was then a CBS director) that "Viacom is tanking"[80] and worried that "time ha[d] run out" for Viacom and that NAI may not be able to "get out from [u]nder it."[81]

In January 2017, Ms. Redstone e-mailed Seligman—then a director at Viacom—to seek her help in finding a new CBS director, stating: "I need another you" and "someone whose loyalty to [NAI] I can trust."[82] She asked Seligman to meet for coffee the following Friday, signing off "Xoxox."[83] Seligman was co-chair

---

[78] Compl. ¶ 53.

[79] *Id.*

[80] Compl. ¶ 56 (quoting CBS 00004135).

[81] *Id.* (quoting CBS 00004205).

[82] Compl. ¶ 31 (quoting CBS 00004214).

[83] *Id.*

of the Viacom special committee in 2016, and would later retain that same role in 2018 and 2019.[84]

In late 2017, Verizon floated its interest in acquiring CBS with NAI's financial advisor, Evercore Partners.[85] The deal withered before its first breath when NAI insisted that "any approach would also have to include Viacom."[86] Evercore told Verizon's advisors that Ms. Redstone's focus was to "put [the] companies [Viacom and CBS] back together again."[87]

Meanwhile, the performance delta between Viacom and CBS continued to expand over the ensuing months. In January 2018, the NAI Parties were advised by Evercore and their legal advisors that CBS had outperformed the market over the previous ten years while Viacom's performance lagged, and the trading multiples of the two companies reflected this reality.[88] The NAI Parties were also informed that "[t]here was further significant downside risk at Viacom if organic growth did not

---

[84] *Id.*

[85] Compl. ¶ 59.

[86] *Id.* (quoting CBS 00004207).

[87] *Id.* (quoting CBS 00004209) (Shari Redstone noting, "my focus" is to combine CBS and Viacom).

[88] Compl. ¶ 57.

accelerate."[89]   Because there was a "risk" that no buyers would be interested in acquiring Viacom if NAI were to put both companies up for sale, Evercore advised that "a sale of [NAI]" was preferable to a sale of either or both of CBS and Viacom, and concluded that "[t]he ideal scenario for [NAI] may be a combination of [CBS] and [Viacom] as a first step, followed by a sale of [NAI]."[90]   According to NAI's advisors, if Viacom and CBS were to combine, then NAI could expect a sale premium as high as 50%.[91]

### E. The Second Merger Attempt

In the same month the NAI Parties received this advice, Ms. Redstone again proposed that CBS and Viacom merge.[92]   On February 1, 2018, CBS's N&G Committee met to discuss, *inter alia*, the formation of a special committee.[93] Ms. Redstone attended part of that meeting and, later that day, the full CBS Board

---

[89] *Id.*

[90] Compl. ¶ 58 (quoting CBS 00004219).

[91] Compl. ¶ 159.

[92] Compl. ¶ 61.

[93] Compl. ¶ 62.  Viacom, for its part, formed its own special committee that was again comprised of the directors appointed by Redstone in 2016.  Compl. ¶ 64.

resolved to create a special committee to consider a possible merger with Viacom.[94] The Viacom Board followed suit soon after.[95]

Again, governance and management was a central concern for CBS's special committee and, again, CBS's special committee ultimately concluded the merger was "not in the best interest of all the Company's stockholders," in part because the NAI Parties again refused to agree to a majority-of-the-minority condition.[96] In a dramatic turn, the CBS special committee further determined that Ms. Redstone and NAI "presented a significant threat of irreparable and irreversible harm to the Company and its stockholders" because they were seeking "to combine CBS and Viacom regardless of the strategic and economic merits of the transaction."[97]

Concerned that Ms. Redstone would not accept rejection a second time,[98] the CBS special committee recommended a dividend of CBS Class A stock to all of CBS's stockholders in an effort to dilute NAI's voting control from approximately

---

[94] Compl. ¶ 58.

[95] Compl. ¶ 59.

[96] Compl. ¶¶ 66–67.

[97] Compl. ¶ 67.

[98] Compl. ¶ 66. More specifically, the CBS special committee worried Ms. Redstone would apply private pressure on directors, eliminate CBS management, continue private discussions about forcing CBS to bail out Viacom and make it difficult for CBS's management to execute on its strategic plan. *Id.*; *see also* CBS 00005723.

80% to 17%.[99]   On May 14, 2018, CBS's special committee filed preemptive litigation against the NAI Parties in this court seeking a declaration that the dividend was valid and asserting breach of fiduciary duty claims against Ms. Redstone and NAI.[100]   The CBS special committee also sought a temporary restraining order to prevent Ms. Redstone from interfering with (1) the CBS Board's composition, (2) the scheduled May 17 CBS Board meeting to approve the dividend, and (3) the dividend.[101]   As this Court then observed, "[b]y any reckoning, the Dividend Proposal [was] an extraordinary measure, presumably reflective of the depth of concern the independent members of the Special Committee [had] about Ms. Redstone's intentions."[102]

On May 16, just before the TRO hearing, Ms. Redstone's counsel informed the Court that Ms. Redstone and NAI had executed and delivered written consents to amend CBS's bylaws to allow her veto control over the dividend.[103]   The Court then derided that "act of self-help" as a tactic that resembled the "dropping [of]

---

[99] Compl. ¶ 67.

[100] Compl. ¶¶ 68–69.

[101] Compl. ¶ 69.

[102] *CBS Corp.*, 2018 WL 2263385, at *2.

[103] Compl. ¶ 70.

consents [to remove directors] in the dark of the night in the [2016] Viacom matter."[104]

The NAI Parties countersued CBS, its non-NAI directors and certain officers, alleging breaches of fiduciary duty.[105] NAI alleged, *inter alia*, that Ianniello, CBS's COO at the time, "knowingly breached his own fiduciary duties and knowingly and actively assisted the Director Defendants in breaching their fiduciary duties, including through his participation in and encouragement of the [d]irector [d]efendants' decision to declare the extraordinary dilutive dividend . . . ."[106] NAI also alleged that Ianniello's compensation package was excessive and improper because he was entitled to a payout of more than $60 million if he resigned for "good reason" and this "was not approved, or even discussed, by the full Board prior to the agreement being signed."[107]

After CBS Board Chairman and CEO, Leslie Moonves, was ousted due to allegations of misconduct, the litigation between NAI and the CBS Board abruptly

---

[104] *Id.* (quoting May 16, 2018 Tr. at 58, 76).

[105] Compl. ¶ 72.

[106] Compl. ¶ 73 (quoting CBS 00004073).

[107] Compl. ¶ 74 (quoting CBS 00004024).

settled in September 2018.[108] In relevant part, the 2018 Settlement addressed several issues related to Ms. Redstone and NAI, the CBS Board's composition and structure, as well as CBS's management.

First, as to Ms. Redstone and NAI, both were prohibited from proposing for a period of two years "directly or indirectly" that CBS merge with Viacom, "unless at least two-thirds (2/3) of the CBS directors not affiliated with NAI proposed one or asked for a proposal."[109]

Second, several members of the CBS Board resigned to make way for six new directors: Beinecke, Byrne, Goldner, Parsons, Schuman and Zelnick.[110] Ms. Redstone, Klieger, Countryman, Gordon, Minow, Griego and Cohen would remain on the Board, and Gordon was named CBS's lead independent director. Countryman, Gordon, Minow, Griego and Cohen were designated as the "Continuing Independent Directors."[111] Gordon and Cohen departed the CBS Board soon after, leaving the CBS Board with eleven directors.[112]

---

[108] Compl. ¶ 75 (citing CBS 00006097).

[109] Compl. ¶ 82.

[110] Compl. ¶ 76.

[111] *Id.*

[112] Compl. ¶¶ 78–80. Gordon had chaired the 2018 CBS special committee, had been a key negotiator with Viacom's special committee and had taken the lead on presenting the dividend proposal at the May 2018 CBS Board meetings. Compl. ¶ 79. Plaintiffs allege

Third, the CBS Board reconstituted its Compensation, N&G and Audit Committees to include directors "not affiliated with any of the NAI Entities or their respective affiliates."[113] These committees were tasked with identifying CBS Board nominees, overseeing all aspects of good corporate governance and reviewing related-party transactions, including those with NAI.[114] The Compensation Committee comprised Zelnick (Chair), Cohen and Griego.[115] The N&G Committee comprised Beinecke (Chair), Gordon, Minow and Parsons.[116] Parsons was named interim Chairman and the CBS Corporate Governance Guidelines were amended to require the Chairman to preside "at meetings of non-management directors and independent directors."[117] Parsons resigned from the CBS Board shortly thereafter and was replaced by Terrell.[118] Ultimately, Zelnick, a close friend of Ms. Redstone's

---

both directors (Gordon and Cohen) were "effectively kicked out" by Ms. Redstone and NAI. Compl. ¶ 80.

[113] Compl. ¶ 77.

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] Compl. ¶ 81.

[118] *Id.*

and one of CBS's newly appointed directors, was named Interim Chairman.[119] When the CBS Board's "independent" directors would later meet to consider a merger with Viacom for the third time, Zelnick presided.[120]

Finally, with respect to management, Ianniello was appointed as CBS's President and Acting CEO.[121] His employment agreement was amended, allowing him to resign for good reason (triggering designated payments) if CBS did not name a permanent CEO by a certain date or if it hired someone else; his base salary remained unchanged (the "First Ianniello Amendment").[122] While Ms. Redstone previously objected to Iannielo's $60 million golden parachute provision, she did not seek to alter it substantively in the First Ianniello Amendment.[123] And, although CBS purportedly embarked on a CEO search and formed a "Search Committee" in connection with the 2018 Settlement, with Ms. Redstone as a member,[124] it does not

---

[119] Compl. ¶¶ 24, 81.

[120] *Id.*

[121] Compl. ¶ 83.

[122] *Id.*

[123] *Id.*

[124] Compl. ¶ 84 (citing CBS 00006214).

30

appear that the Search Committee ever worked to locate a permanent CEO for CBS prior to the Merger.[125]

### F. The Third and Final Merger Attempt

In September 2018, Ianniello met Ms. Redstone for lunch at the Pierre Hotel in New York to inform her that he had a change of heart regarding the merits of a Viacom/CBS merger.[126] Though he had opposed the merger less than four months earlier, after the 2018 Settlement had altered the composition of the CBS Board, Ianniello confided in Ms. Redstone that he now believed "there were benefits to a potential business combination of CBS and Viacom."[127] With Ianniello now "willing to play ball," and the CBS Board now stacked with her designees, Ms. Redstone set her sights on a third attempt to cause a Viacom/CBS merger.[128]

---

[125] *Id.* Plaintiffs allege, on information and belief, that Ms. Redstone foreclosed any meaningful CEO recruitment, as a new CEO would stand as a potential impediment to a merger. With Ianniello well-incentivized to support (or at least not oppose) the merger she wanted, Ms. Redstone had no reason to hire a permanent CEO. *Id.*

[126] Compl. ¶ 85.

[127] *Id.* (quoting CBS Am. Form S-4, dated Oct. 24, 2019 ("Proxy") at 81).

[128] *Id.*

### 1. The Seeds of the Merger Are Sown

It was understood after the 2018 Settlement that CBS's N&G and Compensation Committees were to operate free of NAI's influence.[129] Nevertheless, four months after the 2018 Settlement, on January 30, 2019, Ms. Redstone attended a joint meeting of the Compensation and N&G Committees solely focused on an evaluation of Ianniello's performance and then a separate Compensation Committee meeting that same day to discuss Ianniello's 2018 bonus plan awards.[130] The next day, the CBS Board heard from management regarding the Company's long-range business plans and from representatives of Centerview Partners and Lazard Fréres & Co. LLC regarding "their views on strategic alternatives available to the Company."[131] A week later, Zelnick (whose son works for Viacom) put Ms. Redstone in contact with Robert Pruzan, co-founder of Centerview, who attended the January 31, 2019 CBS Board meeting.[132] On February 16, 2019, Bakish, as Viacom's CEO, asked Ms. Redstone at a Viacom virtual town hall about

---

[129] Compl. ¶ 86.

[130] Compl. ¶¶ 86–87.

[131] Compl. ¶ 87 (quoting CBS 00001749).

[132] Compl. ¶ 88.

a Viacom/CBS merger, and she responded: "I do believe scale matters and we probably will look for transactions to accelerate our strategy."[133]

On February 21, 2019, a group of purportedly independent CBS directors, with Zelnick presiding, met to hear from Centerview (with Pruzan in attendance) and Lazard about "strategic acquisition opportunities," with a focus on Viacom.[134] The advisors presented the CBS directors with various financial metrics revealing Viacom's revenue declined from $10.2 billion in 2014 to a projected $9.9 billion in 2019, while its operating income before depreciation and amortization fell from $4.4 billion to an expected $3.2 billion in the same period.[135] The meeting concluded with a discussion of "next steps in the process for considering strategic alternatives," but without a decision on whether to pursue a Viacom transaction or to invite a proposal.[136]

On that same day, Ms. Redstone attended another Compensation Committee meeting in which Ianniello's compensation was discussed.[137] Ms. Redstone then

_____

[133] Compl. ¶ 89.

[134] Compl. ¶ 90 (quoting CBS 00001743).

[135] *Id.*

[136] *Id.*

[137] Compl. ¶ 91.

33

met with the committee in executive session to "continue[] discussions."[138] The minutes of the meeting omit all details of that discussion.[139]

On February 22, Ms. Redstone attended a N&G Committee meeting.[140] While the chair of that committee (Beinecke) was required to "determine in advance of each meeting whether any non-Committee members may attend the meeting," it does not appear that any such determination was made to allow Ms. Redstone to attend.[141] During the N&G Committee's "executive session," Ms. Redstone discussed the return of Centerview and Lazard "to continue more detailed discussions with the independent directors regarding strategic possibilities for the Company."[142] Ms. Redstone also discussed "the retention of outside counsel for the independent directors."[143] After Ms. Redstone left the meeting, "discussion continued" between Beinecke and Minow, and they determined to recommend that the CBS Board form a special committee.[144]

---

[138] Compl. ¶ 92 (quoting CBS 00005149).

[139] *Id.* (citing CBS 00005153).

[140] Compl. ¶ 94.

[141] Compl. ¶ 95.

[142] *Id.* (quoting CBS 00002036).

[143] *Id.*

[144] *Id.*; Compl. ¶¶ 102–04.

The N&G Committee Charter requires the committee to "report regularly to the entire Board and . . . submit to the Board the minutes of its meetings."[145] But it does not appear that the N&G Committee relayed Ms. Redstone's participation and input at their meeting, or the minutes of the meeting, to the full CBS Board.[146] And the meeting is not mentioned in the Proxy related to the Merger.[147]

CBS's then-Chief Legal Officer, Lawrence Tu, attended the February 22 N&G Committee meeting and then resigned abruptly the same day for "Good Reason," as defined in his employment agreement. That agreement permitted his resignation if, *inter alia*, he was assigned "duties or responsibilities . . . materially inconsistent with his position, titles, offices, or reporting relationships as they existed on the Effective Date or that materially impair [his] ability to function as Senior Executive Vice President and Chief Legal Officer of CBS."[148] Tu's "Good Reason" resignation resulted in CBS paying him more than $9 million in severance.[149]

---

[145] Compl. ¶ 97.

[146] Compl. ¶ 98.

[147] Compl. ¶ 97.

[148] Compl. ¶ 98.

[149] *Id.*

**2. The Special Committee Is Formed and Ianniello Is Further Incentivized to Facilitate the Merger**

The "CBS Independent Directors" met again on March 9, 2019, with Lazard and Centerview in attendance, to "focus on a potential combination with Viacom."[150] This focus was not surprising since Ms. Redstone had previously advised Centerview's co-founder that, "if [the bankers] wanted to be paid, their sole focus needed to be [on] Viacom."[151] During the meeting, Ianniello "presented management's recommendation that the Company take next steps in exploring a possible combination with Viacom."[152] Neither Beinecke nor Minow advised their fellow "independent directors" that Ms. Redstone had attended the February 22 N&G Committee meeting or that the committee had discussed, at her urging, "strategic alternatives" and the formation of a special committee.[153] At the conclusion of the meeting, it was determined that legal counsel should be retained to advise "the independent directors in connection with their continued evaluation of a potential business combination of CBA [sic] and Viacom."[154]

---

[150] Compl. ¶ 100 (quoting CBS 00001741).

[151] *Id.*

[152] *Id.* (quoting CBS 00001742).

[153] *Id.*

[154] Compl. ¶ 102 (quoting the March 9 meeting minutes).

During its next meeting on March 22, the "CBS Independent Directors" determined that their group should not have a chair.[155] While this left the "ship without a real captain," the lack of a skipper did not matter since the ship was sailing on auto-pilot toward "a pre-ordained destination."[156] Consistent with directions given by the controller, the bankers and the *ad hoc* committee they advised, comprised mostly of short-time CBS directors "hand selected by [Ms.] Redstone," focused all energies on a deal with Viacom.[157] Beinecke was put in charge of interfacing with legal counsel while Byrne and Terrell would interface Centerview and Lazard.[158] It does not appear that the holdover directors, Countryman, Minow and Griego, each of whom were on the 2018 CBS special committee that sued NAI in 2018, played any substantive role in the process.[159] On April 4, the "CBS Independent Directors" met again, with Zelnick presiding, and directed Ianniello to "negotiate and complete" the Viacom transaction.[160]

---

[155] Compl. ¶ 104.

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] Compl. ¶ 105 (quoting CBS 00000269).

On April 9, 2019, the CBS Board formally established a special committee.[161] Consistent with the singular focus of its predecessors, the CBS Committee's charter—signed by Ms. Redstone, Klieger and Zelnick—authorized the special committee to evaluate and negotiate only a "combination of the Company with Viacom" and not any other strategic alternatives.[162] It also specifically withheld from the committee the authority to alter the "hiring, selection, compensation or termination of any senior executive of the company, amendment of the bylaw . . . or the declaration or payment of any dividends."[163] Neither the 2016 nor the 2018 CBS special committee charters contained similar limitations.[164]

On April 12, 2019, the Compensation Committee met to discuss a potential extension of Ianniello's employment agreement.[165] Again, apparently without invitation, Ms. Redstone attended.[166] The committee discussed "various approaches to a possible extension, which would, among other things, consider scenarios in

---

[161] Compl. ¶ 106.

[162] *Id.* (quoting CBS 00001794).

[163] *Id.*

[164] *Id.* (citing CBS 00004761–62; CBS 00004752–53).

[165] Compl. ¶ 107 (citing CBS 00004779).

[166] *Id.*

which Mr. Ianniello is not determined to be the permanent Chief Executive Officer."[167]

On April 23, 2019, Ianniello and CBS amended Ianniello's employment agreement for a second time (the "Second Ianniello Amendment"), increasing his base salary from $2.5 million to $3 million, guaranteeing a cash bonus for 2019 of $15 million (up from a potential of $12 million), and providing him with an immediate, lump sum payment of $5 million.[168] The Second Ianniello Amendment also modified Ianniello's "Good Reason" trigger to include additional language that allowed him to receive his entire compensation package with "the appointment of a permanent" CEO, and then to stay on for a compensated "consulting period."[169] According to reporting from Bloomberg, Ianniello agreed to this "hefty payout" in return "for supporting the deal [with Viacom] without having a shot at the top job."[170]

---

[167] *Id.* (quoting CBS 00004779).

[168] Compl. ¶ 108.

[169] Compl. ¶¶ 108–09.

[170] Compl. ¶ 108 (citing *ViacomCBS Name Cheeks as CBS President, Replacing Ianniello*, BLOOMBERG NEWS (Jan. 31, 2020)).

### 3. The CBS Committee Negotiates in Ms. Redstone's Shadow

NAI communicated with the CBS and Viacom special committees "throughout the process," so much so that NAI requested that CBS and Viacom reimburse it for its transaction-related expenses.[171] NAI's legal counsel emphasized to the CBS Committee that NAI had been unwilling to commit to a majority of the minority vote condition in the 2016 and 2018 merger discussions, signaling that Ms. Redstone would not agree to that condition this time either.[172] The signal was received loud and clear; the CBS Committee never asked that the Merger be conditioned on a majority-of-the-minority stockholder vote.[173]

Prior to engaging with Viacom for the third time, CBS's advisors identified several "key" issues the CBS Committee should press for during negotiations.[174] "Board composition" and "[c]ommittee representation" were flagged as key governance issues.[175] "Management at C-suite level" and "[k]ey operational roles" were flagged as critical management objectives.[176] "Other" key tactical issues

---

[171] Compl. ¶ 110 (quoting Proxy at 88).

[172] Compl. ¶ 111 (citing Proxy at 82).

[173] *Id.*

[174] Compl. ¶ 112.

[175] *Id.* (quoting CBS 00000068).

[176] *Id.*

identified were the combined company's "name / HQ / listing," and "[p]otential NAI commitments with respect to the transaction."[177]

With these objectives identified, on June 14, 2019, the CBS Committee began negotiations, and Byrne was tasked with updating NAI, and by extension Ms. Redstone, on the committee's progress.[178] Notwithstanding its pre-negotiation playbook, the CBS Committee did not push to have Ianniello as CEO, expressing instead a "desire to appoint Mr. Ianniello to a position in which he would have an important role at the combined company."[179] As it turns out, Ms. Redstone had already provided Byrne with her "views" regarding the leadership and management of the combined company, prompting the CBS Committee to:

> "Acknowledge[] that, in light of Mr. Ianniello's relationship with Ms. Redstone, it was unlikely that the Special Committee would be able to successfully make progress in evaluating or negotiating a Potential Transaction unless the Special Committee acknowledged to Viacom that it was willing to enter into a Potential Transaction in which Mr. Bakish (and not Mr. Ianniello) would be appointed the Chief Executive Officer of the combined company . . . ."[180]

---

[177] *Id.*

[178] Compl. ¶ 113 (citing CBS 00000068).

[179] *Id.* (quoting CBS 00000068)

[180] Compl. ¶ 114 (quoting CBS 00000076).

41

The rather abrupt decision to defer to Bakish's leadership stood in stark contrast to CBS's insistence in 2018 that Bakish must have no role in the combined company.[181] And, as noted, it ran counter to the key management objectives set out by CBS's advisors at the start of the negotiations.[182]

On June 24, 2019, Byrne updated Ms. Redstone on the progress of negotiations and, again, Ms. Redstone made clear her imperatives regarding governance of the combined company.[183] Ms. Redstone instructed Beinecke that Viacom's CFO and general counsel should remain in those roles post-merger, Ianniello should only have a short-term role post-merger and that CBS senior management could not stay on post-merger because their presence would inappropriately "isolate" the now-presumptive CEO, Bakish.[184] Given these pre-Merger directions, it is not surprising that ViacomCBS is now managed primarily by Viacom executives.[185]

---

[181] Compl. ¶ 115 (citing CBS 00005652).

[182] Compl. ¶ 112 (citing CBS 00000068).

[183] Compl. ¶ 118 (citing CBS 00000136). Beinecke is also alleged to have leaked to Ms. Redstone confidential discussions of the CBS Committee, despite the fact that Byrne was the chosen arms-length conduit between the committee and NAI. *See* Compl. ¶ 119.

[184] Compl. ¶ 119 (citing CBS 00000073).

[185] *Id.*

On July 15, 2019, the CBS Committee made the first offer, and proposed to Viacom that Bakish serve as CEO.[186] Even though it was purportedly the buyer, CBS also allowed that its designees would comprise only half of the board of the combined company.[187] Days later, Viacom made a counter proposal.[188] In it, Viacom/NAI: (i) agreed to Bakish as CEO, (ii) rejected CBS's request that a change in the number of total directors require approval by a majority of non-NAI directors, (iii) provided no protection from removal for any CBS executives other than Ianniello, (iv) pressed for D'Alimonte, Viacom's General Counsel, to remain in that position, (v) proposed that Ms. Redstone's close friend and Viacom confidant, Seligman, serve as chair of the all-important N&G Committee, (vi) proposed that CBS be renamed "Viacom" and (vii) proposed a 15-member board, the majority of which would be comprised of NAI and Viacom designees.[189]

The CBS Committee countered with a revised proposal on July 25, 2019, asking that the combined company's board be comprised of twelve directors, with six chosen by CBS, four by Viacom and two by NAI, one of whom would be the

---

[186] Compl. ¶ 121 (citing CBS 00000334; Proxy at 94).

[187] *Id.*

[188] Compl. ¶ 122 (citing CBS 00000062; CBS 00000332 (indicating the proposal came from NAI)).

[189] *Id.* (citing CBS 00000331–33).

CEO.[190] Viacom responded days later with a counterproposal that had Bakish and D'Alimonte serving as CEO and General Counsel, respectively, of the combined company, and a board comprising thirteen directors: six chosen by CBS, four by Viacom and two by NAI, with the CEO (i.e., Bakish) serving as the final director.[191] The CBS Committee informed Ms. Redstone that it was "holding firm on its previous proposal that the board of directors of the combined company initially be comprised of 12 members."[192] Ms. Redstone also held firm—the board of the combined company would have thirteen members, seven of whom were affiliated with either NAI or Viacom. The CBS Committee quickly acquiesced.[193] NAI also got the final say on the name of the post-merger company, which, in an unusual turn, placed the target's name in front of the acquirer's—"ViacomCBS."[194]

After settling on management and board composition, the negotiations shifted to the exchange ratio in what was to be a stock-for-stock transaction.[195]

---

[190] Compl. ¶ 123.

[191] Compl. ¶ 124.

[192] Compl. ¶ 125 (citing CBS 00000060).

[193] *Id.*

[194] *Id.* (citing Proxy at 99).

[195] Compl. ¶ 126. Again, Plaintiffs point out the contrast between the negotiating approach taken by the CBS Committee in 2019 and the approach taken one year earlier, when the then-extant committee agreed to discuss the exchange ratio only after achieving

On August 1, 2019, CBS learned that Viacom was likely to lower its financial guidance to the market.[196] Yet the CBS Committee did not use this information to negotiate a better deal.[197] Instead, it agreed two weeks later to an exchange ratio of 0.59625 shares of CBS Class A or B stock for each Viacom Class A or B share, respectively.[198] This represented "effectively an at-the-market exchange."[199]

On August 13, 2019, CBS and Viacom announced the Merger.[200] The announced terms reveal that Ms. Redstone won on nearly every key deal point she sponsored:

- CBS's minority stockholders had no vote, allowing NAI to approve the merger by written consent;[201]

- Bakish was named CEO of ViacomCBS; and D'Alimonte was named General Counsel of ViacomCBS;[202]

---

management and other governance victories for CBS, including board composition and minority stockholder protections. *Id.* (citing CBS 00004915; CBS 00004918–19).

[196] Compl. ¶ 127 (citing CBS 00000111).

[197] *Id.* The 220 Documents provide no indication that CBS ever asked Viacom about its lowered financial outlook, much less attempt to use the information as a lever in negotiations. Compl. ¶ 142.

[198] Compl. ¶ 127.

[199] *Id.*

[200] Compl. ¶ 129.

[201] *Id.*

[202] *Id.*

- Ms. Redstone chairs the board of ViacomCBS;[203]

- Seligman chairs the N&G Committee; [204]

- Ianniello would only stay on for a short transition period before being let go and cashed out; [205]

- Directors and an officer (Bakish) aligned with Viacom's and the NAI Parties' interests control the ViacomCBS board; [206]

- In the event of any stockholder litigation against CBS or any of its directors or officers in which any NAI party was also named (including Ms. Redstone herself), CBS could not settle such litigation without prior written consent of NAI unless the settlement (i) did not include any equitable remedies materially adverse to any NAI party and (ii) did not require CBS to make any disclosures about, *inter alia*, negotiations, financial analyses performed and the interests and relationships among the parties that are materially adverse to the NAI Parties;[207] and

- Ms. Redstone and NAI retain 79.4% control of ViacomCBS.[208]

---

[203] *Id.*

[204] *Id.*

[205] *Id.* In connection with the Merger, Ianniello's employment agreement was amended for a third time to clarify that he was entitled to the "Good Reason" termination payments (in excess of $70 million), but also a new contract that paid an additional $3 million per year, a minimum annual target bonus of $15 million, and 450,000 restricted stock units. Compl. ¶ 132 (citing CBS 00001117).

[206] Compl. ¶ 129.

[207] Compl. ¶ 151 (citing CBS 00000110; CBS 00001374). The only carve out to romanette (ii) is if such disclosures are materially adverse to the NAI parties. *Id.* The upshot is that NAI would permit corrective disclosures only if it received a release of stockholder claims challenging the Merger.

[208] Compl. ¶ 129.

Aside from Ms. Redstone and Klieger, only six members of the thirteen member ViacomCBS board are former CBS directors, most of whom were installed by Ms. Redstone in connection with the 2018 Settlement.[209] Griego and Terrell, who replaced Parsons on the CBS Board in late 2018, also remain.[210] The other seven members of the ViacomCBS board are Ms. Redstone, Klieger, four Viacom directors who voted for the Merger as Viacom directors (McHale, Nelson, Phillips and Seligman), and Bakish.[211] Ms. Redstone installed three of those seven directors—Seligman, McHale, and Nelson—on the Viacom Board in 2016.[212] As noted, these thirteen directors comprise the Demand Board that would have considered a demand to pursue CBS's claims arising from the Merger had Plaintiffs elected to make that demand.

After the Merger was announced, CBS Class B stock fell overnight from $48.70 to $44.65 per share, and continued to decline, closing at $39.34 on December 3, 2019, the day before the Merger closed.[213] According to Plaintiffs,

---

[209] *Id.*

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] Compl. ¶ 133.

CBS knew that agreeing to acquire Viacom would cause CBS's stock price to plummet because that is precisely what happened the year before when news of the renewed 2019 merger talks first surfaced, causing "an $8.7 billion loss in market cap."[214] Not only did the CBS Board approve a deal it had reason to know would be value dilutive, the CBS Committee did not ensure minority protections notwithstanding its firm stance on behalf of the minority in 2018.[215]

On October 16, 2019, CBS and Viacom amended the Merger agreement to provide that ViacomCBS stock, which under the initial Merger agreement was to remain listed on the NYSE, instead would be listed on the NASDAQ (Viacom's existing exchange) and trade under the stock ticker symbols VIACA (for class A) and VIAC (for class B).[216] The companies never provided the market with an explanation for this change.[217]

On November 14, 2019, Viacom reported that its third-quarter profits fell 22% from the same time the previous year, with revenue $50 million lower than the last

---

[214] Compl. ¶ 134.

[215] *Id.*

[216] Compl. ¶ 138.

[217] *Id.*

fiscal year.[218] The Merger closed on December 4, 2019.[219] Three days later, Bakish publicly announced that ViacomCBS would sell CBS's Manhattan headquarters "Black Rock," where CBS had operated since 1964 in a property designated as a New York City landmark.[220] As NAI directed, Seligman was designated Chair of the N&G Committee without objection from the CBS directors, along with Phillips, Beinecke and Schuman.[221] McHale and Nelson serve on both the Audit Committee and Compensation Committee.[222]

On January 31, 2020, Ianniello left ViacomCBS with thirteen months remaining on his consulting agreement.[223] Though ViacomCBS did not disclose the circumstances of Ianniello's departure, he was conferred compensation and benefits consistent with a "termination without cause" and replaced by a former Viacom

---

[218] Compl. ¶ 142.

[219] Compl. ¶ 144.

[220] Compl. ¶ 148.

[221] Compl. ¶ 145. While CBS and Viacom were negotiating protections for non-NAI directors, the parties agreed that any nominee for non-NAI director vacancies within two years of closing must be recommended by a majority vote of the N&G Committee—the one chaired by Ms. Redstone's close friend, Seligman. Compl. ¶ 146.

[222] Compl. ¶ 145.

[223] Compl. ¶ 149.

employee.[224]  On February 20, 2020, ViacomCBS announced a fourth-quarter net loss of $258 million (compared to a CBS $887 million profit in Q4 2018), resulting in a 17% decline in the Class B common stock price to $29.29.[225]

### 4. CBS Files Its Form S-4

On October 25, 2019, the Securities Exchange Commission declared effective the publicly filed S-4 registration statement in connection with the Merger (the "Proxy").[226]  The Proxy omitted the following facts:

- The reasons CBS's special committee terminated merger discussions with Viacom in 2016;[227]

- That Ms. Redstone then threatened CBS directors that she would get the merger done even if she had to find another way;[228]

- The reasons CBS's special committee terminated discussions with Viacom in 2018;[229]

- That Zelnick wrote directly to Ms. Redstone and Pruzan on February 9, 2019, after the 2018 Settlement, and implored them to speak directly about a merger;[230]

---

[224] *Id.*

[225] Compl. ¶ 150.

[226] Compl. ¶¶ 8, 139.

[227] Compl. ¶ 163.

[228] *Id.*

[229] *Id.*

[230] Compl. ¶ 164.

- That Ms. Redstone attended the February 22, 2019 N&G Committee meeting and, notwithstanding the 2018 Settlement, planted the seeds that fomented the Merger;[231]

- That the N&G Committee determined to form a special committee after the February 22 N&G Committee meeting;[232]

- That, on August 1, 2019, Viacom advised the CBS Committee that it would likely lower its financial guidance;[233] and

- That the CBS Committee did not then attempt to leverage Viacom's declining performance to negotiate a lower acquisition price (i.e., a more favorable exchange ratio).[234]

## G. Procedural History

On September 27, 2019, Bucks County sent its demand for inspection of eleven enumerated categories of documents to the CBS Board.[235] After determining that CBS's voluntary production was inadequate, Bucks County filed a complaint in this Court on October 15, 2019, to inspect CBS's books and records under 8 *Del. C.*

---

[231] *Id.*

[232] *Id.*

[233] Compl. ¶ 166.

[234] *Id.*

[235] 220 Op. at *4.

§ 220.[236] Trial on a paper record was held on November 22, 2019.[237] This Court's decision was issued on November 25, 2019, in advance of the closing of the Merger.[238]

From February 20, 2020 to February 25, 2020, three CBS stockholders filed separate actions in this Court asserting claims in connection with the Merger.[239] On March 31, 2020, the Court granted an order of consolidation and appointment of lead plaintiffs and lead counsel.[240] Plaintiffs then filed their operative Consolidated Amended Complaint on April 14, 2020.[241]

---

[236] *Id.*

[237] *Id.*

[238] C.A. No. 2019-0820-JRS, D.I. 73. The expedited trial and decision were necessary to allow Bucks County time to determine whether to seek injunctive relief with respect to the Merger. Bucks County ultimately did not seek to enjoin the closing, opting instead to seek post-closing damages.

[239] *See Bucks Cty. Emps.' Ret. Fund v. Redstone, et al.*, C.A. No. 2020-0111-JRS (filed Feb. 20, 2020); *Stewart Simon v. Leslie Moonves, et al.*, C.A. No. 2020-0127-JRS (filed Feb. 25, 2020); *Int'l Union of Operating Eng'rs of Eastern Penn. and Del., on behalf of ViacomCBS Inc., v. Shari E Redstone, et al.*, C.A. No. 2020-0128-JRS (filed Feb. 25, 2020).

[240] D.I. 15.

[241] D.I. 38.

The Complaint comprises six counts.[242] Count I alleges a claim for breach of fiduciary duty derivatively on behalf of ViacomCBS against Ms. Redstone, NAI and SMR Trust for disloyally engineering the Merger to bail out Viacom, in violation of the 2018 Settlement.[243]

Count II asserts claims for breach of fiduciary duty derivatively on behalf of ViacomCBS against the Director Defendants and Ianniello.[244] Specifically, the CBS Directors are alleged to have breached their fiduciary duties by facilitating Ms. Redstone's personal interest in saving the NAI Parties' failing investment in Viacom, thereby disloyally elevating the controller's interests over the interests of other CBS stockholders.[245] For his part, Ianniello is alleged to have violated his fiduciary duties by advocating for the Merger out of self-interest in exchange for the lucrative Merger-related compensation package Ms. Redstone had arranged for him, and to facilitate the controller's self-interest, knowing the Merger was unfair to CBS and its stockholders.[246]

---

[242] Compl. ¶¶ 222–67.

[243] Compl. ¶¶ 222–30.

[244] Compl. ¶¶ 231–39.

[245] Compl. ¶¶ 232–34.

[246] Compl. ¶¶ 235–36.

Count III brings individual and class claims against the NAI Parties for breaching their fiduciary duty of loyalty by forcing former CBS Class B stockholders to enter into a Merger that effectively caused CBS stockholders to transfer (or sell) their CBS stock in exchange for stock in a substantively new and less valuable company, resulting in both diluted ownership stakes and diluted value.[247] In other words, Plaintiffs assert this as a direct claim because, notwithstanding how the Merger was characterized by the parties, in reality, the NAI Parties effectively caused Viacom to acquire CBS by using CBS as a merger vehicle and CBS's stock as merger consideration.[248]

Count IV asserts an individual and class claim against Ms. Redstone, the Director Defendants and Ianniello for breaching their fiduciary duties of loyalty and care by, *inter alia*, (1) allowing Ianniello to negotiate the Merger he already signaled he was willing to force CBS to pursue, (2) failing to advocate for the interests of CBS and its public stockholders, (3) allowing Ms. Redstone improperly to influence the Merger negotiations and (4) entering into the patently unfair Merger to the detriment of CBS's public stockholders.[249] Plaintiffs also allege in this Count that

---

[247] Compl. ¶¶ 240–46.

[248] Compl. ¶ 241.

[249] Compl. ¶¶ 249–57.

the Director Defendants and Ms. Redstone further breached their fiduciary duties by causing a materially misleading and incomplete Proxy to be issued when CBS's public stockholders were deciding whether (or not) to cash out their investment in advance of the Merger.[250]

Count V asserts a waste claim against the CBS Directors, Klieger, Zelnick and Ms. Redstone derivatively on behalf of ViacomCBS for increasing Ianniello's compensation through amendments to his employment agreement for no rational business justification or purpose.[251] Specifically, Plaintiffs allege that, as a result of the waste, CBS (now ViacomCBS) was harmed by being forced to pay Ianniello approximately $125 million to garner his support for the Merger.[252]

Finally, Count VI alleges derivatively on behalf of ViacomCBS a claim for unjust enrichment against Ianniello, who accepted a substantially increased severance payment from CBS (now ViacomCBS) as payment for his support of a patently unfair Merger.[253] Because there was no rational business justification or purpose for increasing the financial benefits to Ianniello when the CBS Board,

---

[250] Compl. ¶ 253.

[251] Compl. ¶¶ 258–62.

[252] Compl. ¶ 261.

[253] Compl. ¶ 264.

management and controllers all knew, even before the Merger talks restarted, that Ianniello would not be named as permanent CEO, it is alleged that Ianniello was essentially gifted tens of millions of dollars to steer CBS toward a Merger he knew was unfair.[254]

On June 5, 2020, the NAI Parties, the CBS Committee together with Zelnick, ViacomCBS, Klieger and Ianniello all separately moved to dismiss the Complaint.[255] To follow is the Court's decision on each of the motions.

## II. ANALYSIS

Defendants' several motions to dismiss present several issues, some overlapping and some standing alone. I address them roughly from broadest to most discrete. At the threshold, Plaintiffs argue the motions to dismiss should be converted into motions for summary judgment under Chancery Rule 12(b) since Defendants have relied heavily on matters outside the pleadings to support their motions.[256] While Plaintiffs have good reason to raise this issue, I elect not to decide

---

[254] Compl. ¶ 265.

[255] D.I. 52 (Ianniello); D.I. 56 (CBS Independent Directors); D.I. 58 (the NAI Parties); D.I. 60 (Klieger); D.I. 61 (ViacomCBS).

[256] Ct. Ch. R. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

it since I am satisfied the case should proceed to discovery in any event. Next, I address the parties' dispute regarding whether several of Plaintiffs' claims state direct or derivative claims. Here again, I acknowledge the merits of the dispute but defer its resolution for another day since I am satisfied that, even if derivative, Plaintiffs have well pled demand futility. That leads to the analysis of the demand futility question, which as noted, I answer in Plaintiffs' favor. I then take up Defendants' argument that Plaintiffs have failed to state non-exculpated claims. For reasons explained below, I disagree and therefore deny their motions except as to Plaintiffs' disclosure claim as lodged in Count IV.

## A. The Motions Will Not Be Converted to Motions for Summary Judgment

Consistent with a practice that is now routine in the context of Section 220 books and records inspections, prior to CBS's production of documents in compliance with the Court's final judgment in the Section 220 litigation, Bucks County and CBS agreed that "CBS may, in support of a dispositive motion, submit any full document cited, quoted, or referenced in any such complaint so that the court may 'review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.'"[257] Defendants appear to have interpreted that ostensibly

---

[257] D.I. 74, Juray Decl. Ex. 1 at ¶ 7 (quoting *Clovis*, 2019 WL 4850188, at *14 n.216). CBS later agreed to the same terms with Co-Lead Plaintiff, International Union. Juray

57

unambiguous language as license to incorporate *any portion* of *any document* that Plaintiffs cited in the Complaint for *any purpose* that suited them in the prosecution of their motions. ViacomCBS submitted 31 documents (including 18 documents produced in the Section 220 Action), and yet never once argued Plaintiffs had misrepresented those documents in their Complaint or otherwise had asked the Court to draw unreasonable inferences from the documents.[258] Not to be outdone, the other Defendants submitted another 57 exhibits in support of their motions.[259] Indeed, the

Decl. Ex. 2 at ¶ 7. There is good reason to condition a Section 220 inspection on an understanding that the producing company may utilize documents produced for inspection to support a motion to dismiss when the stockholder plaintiff misstates or manipulates the content of a document to support an otherwise not well-pled claim. With this understanding in hand, the company is incentivized to make a more fulsome production in response to the demand for inspection. But, as explained below, this does not alter the foundation of Chancery Rule 12(b)(6). *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (recognizing that "[a] plaintiff is generally the master of its complaint and can choose what it wants to plead," and holding that the "incorporation condition" for inspection "*does not change the pleading standard* that governs a motion to dismiss") (emphasis in original), *abrogated on other grounds, Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). Notwithstanding the incorporation condition, the court's focus when deciding a motion under Chancery Rule 12(b)(6) must be on the "four corners of the complaint"; all well-pled facts must be deemed as true; and all reasonable inferences must be given to the plaintiff as the non-moving party. *Malpiede v. Townson*, 780 A.2d 1075, 1082, 1090 (Del. 2001).

[258] *See* ViacomCBS Opening Br. in Supp. of Mot. to Dismiss ("ViacomCBS Opening Br.") (D.I. 61) at 5–6 n.2.

[259] *See* Ianniello Opening Br. in Supp. of Mot. to Dismiss ("Ianniello Opening Br.") (D.I. 52) (attaching 16 exhibits, 9 of which were produced in the Section 220 Action); Independent Dir. Opening Br. in Supp. of Mot. to Dismiss ("Dir. Opening Br.") (D.I. 56) (attaching 28 exhibits, 21 of which were produced in the Section 220 Action); The NAI

58

appendices supporting the motions in which Defendants seek pleading stage dismissal rival the heft of what this Court often sees in support of motions for summary judgment. The volume of documents submitted outside the pleadings, alone, raises doubt regarding whether this Court can decide the motions under Chancery Rule 12(b)(6).[260]

Defendants collectively ask the Court, in effect, to "rewrite [Plaintiffs'] well-pled complaint" in favor of their own version of events with documents drafted at a time when litigation relating to their contents was likely.[261] That is not how our Chancery Rule 12(b)(6) works. "The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one."[262]

Parties' Opening Br. in Supp. of Mot. to Dismiss ("NAI Opening Br.") (D.I. 58) (attaching 13 exhibits, 2 of which were produced in the Section 220 Action).

[260] As a general rule of thumb, when the actual weight of declarations and appendices supporting motions to dismiss under Chancery Rule 12(b)(6) substantially dwarf the weight of the motions and briefs supporting the motions themselves, an alarm should sound that perhaps the defendants are bringing their motions under the wrong rule.

[261] *See Clovis*, 2019 WL 4850188, at *14 n.216 ("Section 220 documents may or may not comprise the entirety of the evidence on a particular point. Until that is tested, the Defendants cannot ask the court to accept their Section 220 documents as definitive fact and thereby turn pleading stage inferences on their head. That is not, and should not be, the state of our law.").

[262] *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

Where a defendant improperly and extensively uses Section 220 Documents in support of a Chancery Rule 12(b)(6) motion to support factual inferences that run counter to those supported in the complaint, the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment so that the plaintiff may take discovery before the court determines if pre-trial dispositive relief is appropriate.[263]  In my view, Defendants' serial references to matters outside the pleadings in this case justifies either approach.[264]

After due consideration, I have elected to address the motions as styled rather than delay addressing the legal issues they raise until after discovery.  The oversized record of "matters outside the pleadings" does not alter the outcome of the motions, and the presence of extraneous matter, while distracting, does not justify a delay in

---

[263] *Black v. Gramercy Advisors, LLC*, 2007 WL 2164286, at *1 (Del. Ch. July 23, 2007); *see also Kessler v. Copeland*, 2005 WL 396358, at *4–5 (Del. Ch. Feb. 10, 2005) (converting a motion to dismiss into a motion for summary judgment and allowing plaintiffs the opportunity to take discovery); *Dawson v. Pittco Capital P'rs, L.P.*, C.A. No. 3148-VCN, at 37 (Del. Ch. Dec. 7, 2007) (TRANSCRIPT) (same); *Montgomery v. Erickson Air-Crane, Inc.*, C.A. No. 8784-VCL, at 62–63 (Del. Ch. Apr. 15, 2014) (TRANSCRIPT) (same).

[264] *Compare Brokerage Jamie Goldenberg Komen Rev. Tr. U/A 06/10/08 Jamie L. Komen Trustee v. Breyer*, 2020 WL 3484956, at *6 n.73 (Del. Ch. June 26, 2020) (excluding three disputed references) *with* Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("Pls.' Answering Br.") (D.I. 77), Annex A (identifying at least 166 disputed references to documents in Defendants' briefs that are not accompanied by any showing that Plaintiffs have misrepresented the documents in their Complaint).

deciding important legal issues before the parties expend their resources taking discovery.[265] This was a close call, and the fact the Court, again, has been asked to make this call reflects a troubling trend in the prosecution of motions to dismiss following Section 220 inspections.[266] If the trend continues, I suspect we are not far from the day where this court decides massively briefed motions to dismiss with a single paragraph order notifying the parties that the court has elected both to treat the motions as motions for summary judgment and to afford the parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[267]

## B. The Justiciability of the Disclosure Claims and the Direct vs. Derivative Debate

The parties dispute whether Counts III and IV purport to state direct or derivative claims. Direct claims, of course, belong to the Plaintiffs and are reviewed in this procedural context under Chancery Rule 12(b)(6); derivative claims, by

---

[265] Ct. Ch. R. 12(b).

[266] *See, e.g.*, *Clovis*, 2019 WL 4850188, at *14 n.216 (explaining the limits of the incorporation by reference doctrine and denying defendant's attempt to rewrite plaintiff's complaint through 220 documents); *Voigt*, 2020 WL 614999, at *9 (rejecting defendant's attempt to rewrite the complaint by improperly relying on 220 documents); *In re Dell Techs. Inc., Class V S'holders Litig.*, 2020 WL 3096748, at *14; (Del. Ch. June 11, 2020) (same); *In re WeWork Litig.*, 2020 WL 6375438, at *8 (Del. Ch. Oct. 30, 2020) (same).

[267] Ct. Ch. R. 12(b).

contrast, belong to the corporation and must be reviewed under the more exacting pleading standards set forth in Chancery Rule 23.1.[268]

The disputed counts, in essence, allege that the NAI Parties as controlling stockholders forced CBS to enter into the unfair Merger (Count III), and that Ms. Redstone and the Director Defendants engaged in a flawed process, in service to the controller, including the issuance of a misleading Proxy, that resulted in an unfair Merger that benefited the controller to the detriment of the other CBS stockholders (Count IV). According to Plaintiffs, while Defendants characterize the Merger as a CBS acquisition of Viacom, in fact, the Merger converted CBS into a "substantively new company" and forced CBS stockholders to accept "new, rapidly depleting stock."[269] As such, their claims are not derivative "buy side" claims on behalf of a company that paid too much, but direct "sell side" claims on behalf of stockholders who received too little. Defendants dispute this description and maintain that both Counts III and IV are derivative claims disguised as direct claims in a bold attempt to skirt the pleading-stage scrutiny required under Rule 23.1.

---

[268] *See* Ct. Ch. R. 12(b)(6); Ct. Ch. R. 23.1; *Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del. 1984).

[269] *See* Compl. ¶¶ 240–57.

In determining at the pleading stage whether claims for breach of fiduciary duty are direct or derivative, as with other pleading stage determinations, the court must assume the truth of all well-pled allegations in the Complaint and draw all reasonable inferences in Plaintiffs' favor.[270] In doing so, however, the court does not accept "the form of words used in the complaint," but instead "look[s] to all the facts of the complaint" to determine "whether a direct claim exists."[271] The inquiry is twofold: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the suing stockholders, individually)?"[272]

### 1. Plaintiffs' Disclosure Claims Are Not Justiciable

Before turning to the merits of the direct vs. derivative question, the atypical contours of Plaintiffs' disclosure allegations justify a closer look to ensure those

---

[270] *Dieterich v. Harrer*, 857 A.2d 1017, 1029 (Del. Ch. 2004).

[271] *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) (internal quotations omitted); *see also Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011) ("The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive; rather, the court must look to the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists." (citation omitted)), *aff'd*, 38 A.3d 1254 (Del. 2012); *Dieterich*, 857 A.2d at 1027 ("Even after *Tooley*, a claim is not 'direct' simply because it is pleaded that way, and mentioning a merger does not talismanically create a direct action. Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.").

[272] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

allegations state *any* cognizable claim under Delaware law, whether direct or derivative. The gravamen of Plaintiffs' disclosure claim is that the Proxy's material omissions deprived CBS's public stockholders of the opportunity to decide before the Merger whether to sell or hold their shares.[273] While none of the parties label it as such, this is a textbook "holder" claim—the reductive term used to describe "a cause of action by persons wrongfully induced to *hold* stock instead of selling it."[274] Where, as here, a holder states his cause of action in reference to the fiduciary relationship existing between the Delaware corporation's managers and

---

[273] Compl. ¶ 253 ("The CBS Directors, Shari Redstone, Klieger and Zelnick further breached their fiduciary duties by issuing a materially misleading and incomplete Proxy at a critical time when CBS's public stockholders were deciding whether to cash out their investment."); *see also* Pls.' Answering Br. at 90 ("CBS's stockholders had to decide pre-Merger whether to cash out their investment or accept the risk of holding stock in a new combined company that would reflect Viacom much more than CBS. CBS stockholders were denied material information, and those that maintained their investments based on the deliberately false Proxy watched their investments crater post-Merger."); Oral Argument Tr. (D.I. 97) 127:22–128:8 (Plaintiffs agreeing that "the harm here is an inability to decide whether to hold or sell [stock].").

[274] *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003) (emphasis in original); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 926 (Tex. 2010) ("In a 'holder' claim, the plaintiff alleges not that the defendant wrongfully induced the plaintiff to purchase or sell stock, but that the defendant wrongfully induced the plaintiff to continue holding his stock. As a result, the plaintiff seeks damages for the diminished value of the stock, or the value of a forfeited opportunity, allegedly caused by the defendant's misrepresentations."); Lauren A. Demanovich, *Holding Out for a Change: Why North Carolina Should Permit Holder Claims*, 92 N.C. L. Rev. 988, 992 (2014) ("A holder claim is a suit brought for damages based on the fact that an individual shareholder suffered financial loss after retaining stock for longer than he or she otherwise would have as a consequence of an officer's or director's misrepresentation.").

stockholders, Delaware law applies to the merits under the internal affairs doctrine, as embodied in the Commerce Clause[275] and the Full Faith and Credit Clause.[276]

As an initial matter, while Plaintiffs purport to plead their holder claim as both an individual and class action, they cannot bring a holder claim as a class action under color of Delaware law. As our Supreme Court has made clear, "[a] class action may not be maintained in a purely common law or equitable fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact."[277] Holder claims, at bottom, are grounded in common law fraud or negligent misrepresentation.[278] Thus, class action treatment of holder claims is inappropriate under state law.[279]

---

[275] U.S. Const. Art. I, § 8.

[276] *Id.* Art. IV, § 1; *see also Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1134 (Del. 2016).

[277] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992).

[278] *See Citigroup*, 140 A.3d at 1132–38; *see also* Edward T. McDermott, *Holder Claims— Potential Causes of Action in Delaware and Beyond?*, 41 Del. J. Corp. L. 933, 934 (2017) (hereinafter "*Holder Claims*") ("Holder claims are asserted as common law fraud or negligent misrepresentation causes of action.").

[279] *Teledyne*, 611 A.2d at 474.

At best, then, Plaintiffs have pled a direct, individual holder claim. The question remains whether that claim is (or ought to be) cognizable in Delaware law.[280] In my view of the law, it is not.

In *Malone v. Brincat*,[281] our Supreme Court held stockholders may state a cause of action arising out of directors' false or misleading disclosures even where those disclosures do not call for stockholder action.[282] This led judges both within and outside Delaware to assume that holder claims are viable in Delaware, and some courts have adjudicated holder claims while apparently operating under that assumption.[283] Speculation was fueled in part by then-Vice Chancellor Strine's footnoted observation that, "[u]nder *Malone*, the possibility of a 'holder's' recovery

[280] McDermott, *Holder Claims*, at 933 (explaining that "no Delaware court has ever" addressed directly the legal cognizability of holder claims).

[281] 722 A.2d 5 (Del. 1998).

[282] *Id.* at 14 ("When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty.").

[283] *See San Diego Cty. Emps.' Ret. Ass'n v. Maounis*, 2010 WL 1010012, at *17 (S.D.N.Y. Mar. 15, 2010) ("New York, Delaware, and California recognize the right to pursue 'holder' claims . . . ."); *In re Parkcentral Global Litig.*, 2010 WL 3119403 (N.D. Tex. Aug. 5, 2010) (applying Delaware law and finding "Delaware law allows holder claims to be pursued."); *Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *6, *12 (Del. Ch. Aug. 26, 2005) (allowing a variant of a direct holder claim by reasoning that under *Tooley*, "[a]ny harm was to the unitholders, who either lost their opportunity to request withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests").

66

[] exists."[284]   Twelve years after making this observation, however, then-Chief Justice Strine clarified that Delaware law is not yet settled on whether holder claims are cognizable under our law.[285]   That appears to be the last word on the subject from a Delaware court.

In *Citigroup*, a unanimous Court questioned the wisdom of recognizing a common law cause of action that a stockholder could assert directly against fiduciaries of a Delaware corporation based on allegations that the stockholder was wrongfully induced to hold rather than sell his stock.[286]   Such claims purport to hold fiduciaries liable for corporate disclosures to the market, even when they act without gross negligence, scienter or bad faith.[287]   On its face, at least, this is not consistent with our law.[288]   With this concern perhaps in mind, it is not surprising that, in those states where holder claims are recognized, the courts emphasize that the claim

---

[284] *In re Oracle Corp.*, 867 A.2d 904, 932 n.118 (Del. Ch. Nov. 24, 2004).

[285] *Citigroup*, 140 A.3d at 1134–35.

[286] *Id.* at 1135.

[287] *Id.* at 1136.

[288] *See Orman v. Cullman*, 794 A.2d 5, 41 (Del. Ch. 2002) (observing that the fiduciary duties relating to disclosure "derive from the combination of the fiduciary duties of care, loyalty and good faith"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061–62 (Del. 1996) (holding that directors were exculpated from liability under Section 102(b)(7) of the DGCL for breach of fiduciary duty arising from allegedly misleading disclosures where the disclosures "were made in good faith").

"belongs to the holder and the primary defendant would be the corporation," not the corporation's fiduciaries.[289]

In addition to the basic concern that holder claims may not square with our fiduciary duty law, the Court in *Citigroup* observed that holder claims implicate "numerous policy and proof problems."[290] From a policy perspective, the Court expressed a "general" concern that holder claims breed uncertainty:

> When a public corporation . . . has shares in the market, it will have investors from all around the world, and certainly in virtually every state in our nation. For investors to be able to sue not only under federal law, but purport to sue under their own state's bespoke laws, subjects corporations to potential inconsistencies, inefficiencies, and unfairness.[291]

From a proof perspective, the Court observed that proving the requisite inducement flowing from the alleged misrepresentations will be difficult in a holder claim given that "securities holders may decide to hold or sell stock for various reasons," rendering this *prima facie* element of the claim inherently speculative.[292]

---

[289] *Citigroup*, 140 A.3d at 1137.

[290] *Id.*

[291] *Id.* at 1136.

[292] *Id.* at 1140–41 (citing *Starr Found. v. Am. Int'l Gp., Inc.,* 76 A.D.3d 25, 901 N.Y.S.2d 246, 249 (2010) ("Here, the Foundation seeks to recover the value it might have realized from selling its shares during a period when it chose to hold, under hypothetical market conditions for [the defendant corporation's] stock (assuming disclosures different from those actually made) that never existed. A lost bargain more undeterminable and speculative than this is difficult to imagine." (internal quotations omitted)).

Indeed, when the plaintiff's fraud claim rests on induced inaction, rather than induced action, Delaware courts have found such factual predicates difficult to reconcile with the plaintiff's burden to prove justifiable reliance and damages proximately caused by such reliance.[293] And, while some courts outside of Delaware have summarily found proximate causation in the context of a holder claim by reasoning that the plaintiff's loss "occurred as a result of . . . reliance [upon] a false representation where the inaction was the direct natural and intended result of the false representations,"[294] the flaw in this reasoning was exposed by the Second Circuit in *Lentell v. Merrill Lynch & Co., Inc.*:

> [I]t cannot ordinarily be said that a drop in the value of a security is caused by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated . . . . Thus to establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.[295]

---

[293] *See generally, Vichi v. Koninlijke Philips Elecs. N.V.*, 85 A.3d 725, 807 (Del Ch. 2014) (stating that defendant's intent to induce the plaintiff, and plaintiff's justifiable reliance, are *prima facie* elements of common law fraud); s*ee, e.g.*, *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1177–78 (Del. Ch. 2006) (holding inaction is not legally equivalent to action when assessing justifiable reliance in connection with a claim for fraudulent inducement not to enforce a debt).

[294] *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d at 1068.

[295] *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. Sept. 27, 2016).

Along the same line, common law fraud claims require proof of actual economic loss,[296] but holder claims "are predicated on the fact that there was no *actual* economic loss since no actual transaction by the holder was linked to the alleged wrongdoing."[297] Such metaphysical implications bring to mind Judge Posner's observation, "[t]he near miss is not actionable" in tort law.[298]

Notwithstanding the problems I (and others) see with holder claims as a matter state common law,[299] I need not decide the viability of Plaintiffs' holder claim based on whether the claim is, or should be, cognizable in Delaware. Even if the claim exists in Delaware, Plaintiffs have not well pled the claim here. I endeavor to explain the shortcomings below.

To begin, Delaware law distinguishes between disclosures seeking stockholder action and disclosures that do not seek stockholder action. While the

---

[296] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005); *Clarkson v. Goldstein*, 2005 WL 1331776, at *8 (Del. Super. May 31, 2005) ("[T]o prove fraud, Plaintiffs must demonstrate . . . actual damages.").

[297] McDermott, *Holder Claims*, at 938.

[298] *Stromberger v. 3M Co.*, 990 F.2d 974, 976 (7th Cir. 1993); *see also Anderson v. Aon Corp.*, 614 F.3d 361, 361 (7th Cir. 2010) (Easterbrook, J.) (stating that hypothetical sales would not involve an actual loss or even a legally cognizable "opportunity").

[299] *See* McDermott, *Holder Claims*, at 944–46 (collecting jurisprudential criticisms of holder claims).

latter requires proof of causation, reliance and damages, the former does not.[300]

Presumably in hopes of implicating a lower threshold of proof, Plaintiffs allege the

Proxy constituted a "call for action" in the sense that it came at a critical time when

they were forced to make an "investment decision."[301]  To be sure, Delaware courts

have characterized disclosures relating to "investment decisions," such as

"purchasing and tendering stock or making an appraisal election," as calls for

stockholder action.[302]   But these disclosures reflect instances where "*directors*

request discretionary stockholder action."[303]  In such instances, it follows logically

that when stockholders act following the disclosure, a reasonable inference can be

drawn that the stockholder relied upon the disclosure and that, assuming it is

"material," any harm flowing from the stockholder's action proximately resulted

from such reliance.[304]

---

[300] *Dohmen v. Goodman*, 234 A.3d 1161, 1168–69 (Del. 2020) (citing *Malone*, 722 A.2d at 12).

[301] *See* Pls.' Answering Br. at 90–91.

[302] *Dohmen*, 234 A.3d at 1168 (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013)).

[303] *Id.* (emphasis added).

[304] *See, e.g.*, *Unanue v. Unanue*, 2004 WL 2521292, at *10 (Del. Ch. Nov. 3, 2004) ("[T]o establish a violation of the duty of disclosure, [a plaintiff] must prove that the omitted fact would have been material to the stockholder action sought."); *Zaucha v. Brody*, 1997 WL 305841, at *5 (Del. Ch. June 3, 1997) ("A material fact is one that a reasonable investor would view as significantly altering the 'total mix' of information made available."); *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *13 (Del. Ch.

Plaintiffs' holder claim, by contrast, does not arise out of a disclosure requesting stockholder action. Under these circumstances, reliance, causation and damages cannot be so safely assumed because, by definition, the holders were not asked by the company to act in the manner that gives rise to the claim; indeed, a holder claim is predicated on a stockholder's claim that she did not act at all. In *Latesco, L.P. v. Wayport, Inc.*,[305] Vice Chancellor Laster explained that Delaware's stockholder action paradigm "is premised on the collective action problem that stockholders, in the aggregate, are faced with when asked to vote or tender their shares," where they "would be forced to make a decision in an information vacuum."[306]

Here, Plaintiffs were not "*forced* to make a decision";[307] they were not even *asked* to make a decision. Their vote was neither required nor solicited for the Merger. The Merger was a foregone conclusion when the NAI Parties decided to support it. The stockholders' decision to sell or hold in the wake of the Merger's

Jan. 3, 2013) (explaining a fact is material where "under all the circumstances . . . [it] would have assumed actual significance in the deliberations of the reasonable shareholder." (internal quotations and citation omitted)).

[305] 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009).

[306] *Id.* at *6; *see also Dohmen*, 234 A.3d at 1170–71 (Del. 2020) (endorsing *Wayport*'s statement of the rationale undergirding the stockholder action paradigm).

[307] *Wayport*, 2009 WL 2246793, at *6 (emphasis supplied).

announcement was an individual decision relating to individual transactions. And Delaware courts do not "impose an affirmative duty of disclosure for individual transactions."[308]

Once it is clear the holder claim is not asserted in connection with a disclosure issued in support of a request for stockholder actions, as our Supreme Court observed in *Citigroup*, the claim is not subject to the lesser burden imposed by the stockholder action paradigm.[309] As a practical matter, this means the stockholder must well plead and prove justifiable reliance, causation and damages.[310] In other words, the stockholder making a holder claim must plead facts tantamount to either common law fraud or negligent misrepresentation.[311]

---

[308] *Dohmen*, 234 A.3d at 1171.

[309] *See Citigroup*, 140 A.3d at 1132–38.

[310] *See Grant Thornton*, 314 S.W.3d at 928–30; *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254, 266 (D.N.J. 1990).

[311] I note that the standard for a claim under *Malone* has been characterized as "similar to, but even more stringent than, the level of scienter required for common law fraud." *Metro. Commc'n Corp. BVI v. Advanced MobileComm Techs. Inc.*, 845 A.2d 121, 158 (Del. Ch. 2004). While a common law fraud claim can be established by showing reckless indifference, *Malone* requires knowing misconduct. *Id.* at 158 n.88. Both common law fraud and a *Malone* claim require "reasonable reliance." *Id.* at 157–58. But our Supreme Court has explained the "high bar for *Malone*-type claims . . . [is] to ensure that our law was not discordant with federal standards and that our law did not encourage a proliferation of disclosure claims outside the discretionary vote or tender context by exposing directors to a host of disclosure claims . . . ." *Id.* at 158. (footnote omitted). Though these policy concerns are certainly relevant to the evaluation of holder claims, I assume for the purposes of analysis that holder claims would be subject to a lower common law standard in order

In Delaware, the *prima facie* elements of common law fraud are:

(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[312]

A claim for negligent misrepresentation in Delaware "is essentially a species of fraud with a lesser state of mind requirement, but with the added element that the defendant must owe a pecuniary duty to the plaintiff."[313] At best for Plaintiffs, the Court might ratchet down the holder pleading standard from fraud to negligent misrepresentation because the disclosing parties stand in a fiduciary relationship with Plaintiffs. But where, as here, the CBS Board members are exculpated from duty of care violations, a claim for negligent misrepresentation falls short and Plaintiffs must plead "fraud or intentional misrepresentation."[314]

---

to expose that, even under the most plaintiff-friendly assumptions, Plaintiffs' holder claims cannot survive.

[312] *Vichi*, 85 A.3d at 807; *see also Wayport*, 76 A.3d at 323.

[313] *Vichi*, 85 A.3d at 822.

[314] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *18 (Del. Ch. Dec. 20, 2012) (holding that a claim for negligent misrepresentation cannot survive in the face of an exculpatory charter provision).

Recognizing that stockholders may bring abusive and baseless holder actions any time their investments falter in the wake of corporate disclosure(s), jurisdictions recognizing holder claims "have invariably imposed additional requirements for the pleading and proof of holder claims beyond the allegations showing the elements of fraudulent and negligent misrepresentation causes of action."[315] Some holder jurisdictions require the plaintiff to allege the challenged misstatements were communicated directly to the plaintiff by the named defendants in order to sustain a claim, thereby excluding public disclosures as bases for the claim.[316] Even where public disclosures are deemed "direct" communications to holders, courts have held

---

[315] McDermott, *Holder Claims*, at 937.

[316] *Grant Thornton*, 314 S.W.3d at 928–30 (noting "even those courts that have recognized holder claims in some form generally have demanded that plaintiffs meet heightened pleading and proof standards," and holding "that holder claims, to the extent they are viable, must involve a direct communication between the plaintiff and the defendant."); *Gutman*, 748 F. Supp. at 266 (emphasizing "[o]ne critical feature of the present case" was "[that] Plaintiffs had direct dealings with defendants in which the latter made certain of the representations complained of." That fact made plaintiff's claim an "ordinary case of deceit" as "[s]uch a case could not be brought by anyone who happened to own [the company's] stock." (internal quotations and citations omitted)); *Goldin v. Salomon Smith Barney, Inc.*, 994 So. 2d 517, 520 (Fla. App. 2008) (rejecting a holder claim based on public disclosures under New York law after finding that, "[i]n each of the cases where a plaintiff's holder claim under New York law survived a motion to dismiss, the affirmative misrepresentation was directly [as opposed to publicly] communicated from the defendant to the plaintiff. In the instant case, there was no such direct communication"); *Ohanessian v. Pusey*, 2010 WL 728549, at *1 n.2 (D. Colo. Feb. 25, 2010) (rejecting a plaintiff's holder claim because neither California nor Colorado would provide a cause of action for fraudulent "holding" absent allegations of "an instance where [the plaintiff] actually planned to sell his [] stock but refrained from doing so in reliance on a specific fraudulent misrepresentation of a Defendant").

75

"any theory of loss causation would still have to identify when the materialization occurred and link it to a corresponding loss."[317] Other courts have required that the plaintiff allege specifically when he would have bought or sold a specific amount of a security but for the alleged misstatement.[318] At base, these standards attempt to address the risk of abuse inherent in holder claims by requiring the plaintiff to plead some particularized facts that distinguish the plaintiff from the mass of stockholders who also rely on the market.

While Delaware has yet to weigh in on what precisely must be alleged to state a holder claim, likely because the claim itself has been deemed suspect, our law *is*

---

[317] *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009); *see also Holmes v. Grubman*, 691 S.E.2d 196, 199 (Ga. 2010) (applying Georgia law and imposing on holders "the burden of proving that the truth concealed by the defendant entered the marketplace, thereby precipitating a drop in the price of the security"); *In re Washington Mutual, Inc. Secs. Litig.*, 259 F.R.D. 490, 507 (W.D. Wash. 2009) (finding causation in the context of a plaintiff's holder claim based on an allegedly misleading SEC filing where plaintiffs well pled "that the disclosures caused the drop in price by revealing information previously concealed by Defendants through their misrepresentations"); *Small*, 65 P.3d at 1265 (expressly rejecting under California law the requirement that the misleading statement be made in "personal" communications between parties, but holding that "a plaintiff must allege specific reliance on the defendants' representations . . . . The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations. Plaintiffs who cannot plead with sufficient specificity to show a bona fide claim of actual reliance do not stand out from the mass of stockholders who rely on the market"); *Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1314 (N.D. Fla. 2003) (dismissing holder claims under Florida law because plaintiffs failed to allege how many shares they would have sold and when they would have sold them).

[318] McDermott, *Holder Claims*, at 937.

clear that a claim resting on fraud or negligent misrepresentation must be supported by particularized facts.[319] Plaintiffs make no effort to meet that pleading burden. They do not allege the CBS Board communicated with them directly, as "the alleged misrepresentations were in publicly available documents."[320] Even if Delaware adopted a standard that allowed public disclosures to provide a bases for holder claims, Plaintiffs do not attempt to plead with particularity what they would have sold, when they would have sold and why they would have sold following their review of the Proxy.[321] Indeed, Plaintiffs do not meaningfully attempt to link the material information withheld from stockholders by the CBS Board to a loss in stockholder value by, for example, pleading that when "the truth concealed by the defendant entered the marketplace, [a] precipitating drop in the price of the security

---

[319] *See* Ct. Ch. R. 9; *see also, Fortis Advisors LLC v. Dialog Semiconductors PLC*, 2015 WL 401371, at *1, *6 (Del. Ch. Jan. 30, 2015) (applying Rule 9 to a negligent misrepresentation claim).

[320] *Grant Thornton*, 314 S.W.3d at 930.

[321] *See, e.g.*, *Rogers*, 268 F. Supp. 2d at 1314 (granting a motion to dismiss where the plaintiffs "did not allege specifically, *how many shares* they would have sold and *when* they would have sold them) (emphasis in original); *Small*, 65 P.3d at 1265 (requiring holder plaintiffs to allege specific reliance, "for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place" and requiring allegations of "actions, as distinguished from unspoken and unrecorded thoughts and decisions").

[followed]."[322]   Because Plaintiffs pled their holder claim generally as a class claim without the specificity required to support the claim, it is not surprising they did not meet (or even attempt to meet) their heightened pleading burden.[323]

While Plaintiffs' disclosure claim is a direct claim not subject to heightened pleading under Rule 23.1, it is, in essence, a fraud claim subject to heightened pleading under Rule 9.  Plaintiffs have not met that heightened pleading burden and, therefore, their holder claim as stated in Count IV must be dismissed.

---

[322] *Holmes v. Grubman*, 691 S.E.2d 196, 201 (Ga. 2010); *see* Compl. ¶ 6 (attributing the loss in value of CBS Class B common stock to the evident "unfairness [of the Merger] to CBS and its stockholders"); *accord* Compl. ¶ 133 (attributing the stock's loss in value to the Merger's announcement).

[323] Because Plaintiffs apparently did not realize they were pleading an individual claim subject to Rule 9(b), they failed to carry their heightened burden to plead particularized facts identifying the role each named defendant played in preparing the Proxy or making the alleged misleading statements or omissions.  *See GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *11 (Del. Ch. Oct. 31, 2017); *Abbott Labs v. Owens*, 2014 WL 8407613, at *7 (Del. Super. Sept. 20, 2014) (noting that Rule 9(b) often requires a plaintiff pleading fraud to allege the "time, place and contents of the false representation").

### 2. Counts III and IV – Direct or Derivative Claims?

The parties take fundamentally different views on the essence of Plaintiffs' other breach of fiduciary duty claims as stated in Counts III and IV. According to Defendants, the gravamen of Plaintiffs' claim is that CBS fiduciaries "caused CBS to massively overpay for Viacom."[324] If that, in fact, is the claim, then the claim is derivative.[325] Indeed, "a claim that an entity has issued equity in exchange for inadequate consideration—a so-called dilution claim—is a quintessential example of a derivative claim."[326] And that is precisely how this Merger appears to have been structured. CBS was the putative buyer and surviving entity, providing Viacom stockholders .59625 shares of newly issued ViacomCBS stock (a name adopted by CBS following the Merger) for each Viacom share.[327] NAI executed a support

---

[324] Compl. ¶ 6.

[325] *In re J.P. Morgan Chase & Co. S'holders Litig.*, 906 A.2d 808, 818–19 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006) (holding a claim that the exchange ratio in a stock-for-stock merger was unfair to stockholders of acquiring corporation was a derivative claim for overpayment).

[326] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016) (Strine, C.J., concurring); *see also Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006) ("In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock.").

[327] Compl. ¶¶ 4, 7, 11.

agreement committing to use its nearly 80% voting control over CBS to act by written consent and unilaterally approve the Merger.[328]

Plaintiffs maintain Defendants' portrait of their claim (and the Merger) is a caricature that exaggerates certain features while ignoring the nuance of the form. According to Plaintiffs, "the unique facts of this case reveal that, in reality, the Merger was the vehicle through which the NAI Parties (in complicity with the other Defendants) caused Viacom to acquire CBS."[329]  This reality, say Plaintiffs, is revealed in the fact that nearly every aspect of their investment in CBS changed following the Merger, leaving them with stock in a substantively new company dominated by Viacom.  While Ms. Redstone coerced Ianniello and the CBS Board into playing roles in the dramedy that culminated in the Merger, where CBS ostensibly played the role of acquirer, Plaintiffs urge the Court to look behind the curtain to discern what really happened.  Ms. Redstone, desperate to combine Viacom and CBS, and viewing Viacom as the entity that would emerge from the Merger as superior, caused CBS to be subjugated by Viacom's Board and management in a combined company that would henceforth be known as ViacomCBS.  That company now operates under the control of a majority

---

[328] Compl. ¶ 4.

[329] *See* Pls. Answering Br. at 85.

NAI/Viacom board, with a majority of Viacom's former executives at the helm, in Viacom's former headquarters, and its stock now trades on Viacom's (not CBS's) former exchange (NASDAQ) under the ticker symbols "VIACA" and "VIAC."[330] Plaintiffs argue that, under these circumstances, "[t]here is no rational reason why CBS stockholders do not have direct claims" to recover their losses following the acquisition of CBS at an unfair price.[331]

As Plaintiffs correctly argue, "equity regards substance rather than form."[332] Against this backdrop, Plaintiffs' counter-narrative regarding the true manifestation of the Merger carries some creative force. But the arguments they raise regarding how the Court should characterize their claims are without precedent and they rest on assumptions that are difficult to accept at this stage of the proceedings, when all properly incorporated documents reveal that CBS acquired Viacom. Fortunately, I need not decide at this preliminary stage of the proceedings the definitive nature of Plaintiffs' claims because, for reasons explained below, even if Plaintiffs' claims are derivative, they have well pled them as such. Where the nature of a claim is disputed,

---

[330] Compl. ¶¶ 11, 129–31, 135–38, 140–41, 145–49, 242, 250.

[331] *Id.* at 88.

[332] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond from to the substance of an arrangement.").

and the plaintiff has met its pleading burden under both Chancery Rules 12(b)(6) and 23.1, it is proper to defer the final determination of whether the claim is direct or derivative under *Tooley* until after the factual record on the point is better developed.[333] For purposes of this motion, I treat Counts III and IV as derivative and, therefore, subject the claims to Rule 23.1's heightened pleading requirements.

**C. Demand Futility Under Chancery Rule 23.1**

"[A] cardinal precept of the General Corporation Law of the state of Delaware is that directors, rather than stockholders, manage the business and affairs of the corporation."[334] For purposes of this analysis, the Court assumes that Plaintiffs seek to bring certain derivative claims on behalf of CBS, which means those claims presumptively belong to the company with the Demand Board holding the right to decide how best to exploit the company's litigation asset.[335] And yet, our law allows that, "[i]n certain circumstances, stockholders may pursue litigation derivatively on

---

[333] *See Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746, *9 (Del. Ch. May 5, 1989) ("assuming without deciding that the complaint alleges derivative claims"); *Stevanov v. O'Connor*, 2009 WL 1059640, at *6 (Apr. 21, 2009) (declining to grant summary judgment for plaintiff's failure to plead demand futility after concluding the "Plaintiff *may* be able to show she has a right, consistent with *Tooley* and its progeny, to pursue directly a claim" and "a more thorough development of the record would clarify the law or its application").

[334] *Aronson*, 473 A.2d at 811.

[335] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (explaining that "[i]n most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation").

behalf of the corporation as a matter of equity to redress the conduct of a torpid or unfaithful management . . . where those in control of the company refuse to assert (or are unfit to consider) a claim belonging to it."[336]

Where a derivative plaintiff elects not to make a litigation demand and thus "seeks to displace the board's authority," he must plead particularized facts creating a reasonable doubt concerning the Board's ability to consider the demand.[337] Because a majority of the Demand Board comprises directors not on the CBS Board that approved the Merger, the parties agree *Rales v. Blasband* governs the demand futility inquiry.[338] "The central question of a *Rales* inquiry, no matter the context, is

---

[336] *Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) (internal quotations omitted).

[337] *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012) (citation omitted), *rev'd on other grounds*, *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

[338] More specifically, although a majority of the ViacomCBS board (eight of thirteen) also served on the CBS Board, the Proxy indicates that only six of the "carryover" CBS Board members (Byrne, Beinecke, Griego, Goldner, Schuman and Terrell) voted to approve the Merger, with Redstone and Klieger abstaining. Thus, the parties agree *Rales* applies. *See Rales v. Blasband*, 634 A.2d 927 (Del. 1993); *accord, McElrath ex rel. Uber Techs. v. Kalanick*, 2019 WL 1430210, at *8 (Del. Ch. Apr. 1, 2019), *aff'd sub nom. McElrath v. Kalanick*, 224 A.3d 982 (Del. 2020) (applying *Rales* where, as here, "members of the board who made the business decision in question remain on the board but are now in the minority") (citing *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56–57 (Del. Ch. 2015) ("[T]he *Rales* test applies where a derivative plaintiff challenges a decision approved by a board committee consisting of less than half of the directors who would have considered demand, had one been made.")); *Conrad v. Blank*, 940 A.2d 28, 37 (Del. Ch. 2007) ("Since the challenged transaction was not made by . . . even half of [the board's] members, the test articulated in *Rales* is the proper standard."). I note, however, that this court has questioned the effect of abstention on the standard governing

83

the same: 'whether the board can exercise its business judgment on the corporate behalf in considering demand.'"[339]

A director cannot objectively exercise her business judgment in considering a litigation demand under *Rales* if she is either: (i) "interested," meaning she is directly impacted by or will benefit from the challenged transaction in a manner not shared by other stockholders or faces a "substantial likelihood of liability" for her role in the challenged transaction;[340] or (ii) not independent of another interested fiduciary by virtue of personal or professional relationships or otherwise.[341] "In assessing board level conflicts in the corporate context, this court 'counts heads' among the individual members of the board to assess whether a majority of its members are, or

---

the Rule 23.1 analysis, and different standards may apply in some instances to different directors. *See United Food and Commercial Workers Union v. Zuckerberg*, 2020 WL 6266162, at *19 (Del. Ch. Oct. 26, 2020). Because none of the parties raised this issue, and all agree *Rales* should govern, I apply *Rales* across the board.

[339] *Id.* (quoting *Inter-Mktg. Gp. USA, Inc. v. Armstrong*, 2019 WL 417849, at *4 (Del. Ch. Jan. 31, 2019)).

[340] *Rales*, 634 A.2d at 933.

[341] *Id.* at 936.

are not, conflicted."[342]  If a majority of the demand board is not comprised of independent or disinterested directors, then demand is futile.[343]

The Demand Board consists of 13 directors, eight of whom served on the CBS Board and six of whom voted to approve the Merger.  They are Ms. Redstone, Klieger, Bakish, Beinecke, Byrne, Goldner, Griego, McHale, Nelson, Phillips, Schuman, Seligman and Terrell.  The Demand Board and pre-Merger CBS Board are compared below:[344]

| | CBS PRE-MERGER BOARD | DEMAND BOARD |
|---|---|---|
| 1 | Beinecke | Beinecke |
| 2 | Byrne | Byrne |
| 3 | Goldner | Goldner |
| 4 | Griego | Griego |
| 5 | Schuman | Schuman |
| 6 | Terrell | Terrell |
| 7 | Ms. Redstone* | Ms. Redstone |

---

[342] *See In re EZcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016).

[343] *Wenske v. Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del. Ch. 2019).

[344] Shading indicates directors who served on both the pre-Merger Board and the Demand Board.  Asterisks mark those pre-Merger CBS directors who allegedly did not vote on the Merger.

| 8  | Klieger*   | Klieger  |
|----|------------|----------|
| 9  | Minow      | Bakish   |
| 10 | Countryman | McHale   |
| 11 | Zelnick*   | Nelson   |
| 12 |            | Phillips |
| 13 |            | Seligman |

## 1. Independence

Perhaps in an abundance of caution, Plaintiffs do press an argument, separate from a "substantial likelihood of liability" argument, that a majority of the Demand Board lack independence from Ms. Redstone, a CBS fiduciary who (as pled) was clearly "interested" in the Merger. Delaware law presumes that each member of a board of directors is independent.[345] A plaintiff will overcome this presumption of independence only by pleading "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that

---

[345] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

interested party."[346]   Our Supreme Court explained these concepts succinctly in

*Orman v. Cullman*:[347]

> A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.[348]

When assessing director independence, our courts do not "anthropologize" directors as simply *homo economicus*; instead, other factors, including personal and business relationships, can influence and, at times, compromise independence.  As commentators have noted, Delaware's independence analysis is context-specific and fact-intensive.[349]

---

[346] *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (internal quotation omitted).

[347] 794 A.2d 5, 25 n.50 (Del. Ch. 2002).

[348] *Id.*; *see also Beam*, 845 A.2d at 1049 ("This doubt [of a director's ability to act impartially] might arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director.").

[349] *See, e.g.*, Usha Rodrigues, *The Fetishization of Independence*, 33 J. Corp. L. 447, 470–76 (2008) (reviewing Delaware's independence jurisprudence and concluding, "Delaware is not bound by *ex ante* proscriptions against conflicts with the corporation as a whole.  Instead, it can look deeply into particular conflicts").

As noted, there are 13 directors on the Demand Board, so, under this prong of *Rales*, Plaintiffs must well-plead that seven (i.e., the majority) of the directors lack independence. Plaintiffs do not challenge Terrell, Griego and Phillips' independence.[350] Accordingly, to plead futility solely on the basis of a collective lack of independence, Plaintiffs were obliged to plead that the independence of seven of the ten remaining directors was compromised to a degree that they were unfit to consider a demand.

The result of Plaintiffs' effort to meet this burden, separated from their liability allegations, is a mixed bag. As to some, such as Schuman, McHale, and Nelson, the allegations of their connection to Ms. Redstone focus mainly on business relationships and, standing alone, falter under the weight of the presumption of independence.[351] As for Byrne, the allegations reveal both personal and professional relationships with Ms. Redstone, but again, it would be a stretch to say these

---

[350] Plaintiffs did not challenge these three directors' independence in their answering brief or at oral argument. "It is settled Delaware law that a party waives an argument by not including it in its brief." *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003).

[351] *See, e.g.*, Compl. ¶¶ 22, 76 (alleging Schuman's consulting firm worked with Viacom, Schuman previously worked for a Viacom portfolio company and Schuman was appointed to the Viacom Board by NAI); Compl. ¶¶ 202–03 (alleging McHale served as general counsel for Viacom's MTV in the mid-1980's, while Nelson was the co-chief operating officer of DreamWorks SKG from 1994 to 2003, during which time DreamWorks and Paramount Pictures co-produced several major films).

allegations, standing alone, raise a reasonable doubt regarding Byrne's fitness to consider a demand.[352] Thus, while Plaintiffs make a gallant effort to marshal their allegations into a credible challenge to the Demand Board's independence, given the nature of their liability allegations against the Director Defendants, it is not surprising that Plaintiffs' most persuasive demand futility argument is that the Demand Board labors under a disabling interest by virtue of their exposure to a "substantial likelihood of liability."[353] I therefore leave the independence analysis without drawing any firm conclusions on the adequacy of Plaintiffs' demand futility pleading under this prong of *Rales*.[354]

---

[352] Compl. ¶¶ 15, 76, 208, 211 (alleging Byrne is a "close friend" of Ms. Redstone and serves on a non-profit board with her).

[353] I pause here to note that Defendants' effort to cast Seligman as independent of Ms. Redstone, on the pled facts, did undermine the credibility of their arguments as to other allegedly non-independent directors. As alleged by Plaintiffs, referring to a document produced in the 220 inspection, Ms. Redstone wrote an email to Seligman in 2017 in which she gushed, "I need another you . . . someone whose loyalty to [NAI] I can trust," and closed the email with "Xoxox." Compl. ¶¶ 31, 201. Contrary to Defendants' suggestion that Ms. Redstone and Seligman were mere business associates, the fair inference from the Complaint is that business associates do not typically close their correspondence to one another with "hugs and kisses."

[354] *See Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *16 (Del. Ch. Aug. 24, 2020) (beginning and ending the *Rales* inquiry after finding "that a majority of the Demand Board faces a substantial likelihood of liability . . . and therefore the Demand Board cannot bring its independent and disinterested business judgment to bear in considering a demand"); *Inter-Mktg. Gp. USA, Inc. v. Armstrong*, 2020 WL 756965 (Del. Ch. Jan. 31, 2020) (same).

## 2. Substantial Likelihood of Liability

To plead that a member of the Demand Board faces a "substantial likelihood of liability" as contemplated by *Rales*, a plaintiff need not demonstrate "a reasonable probability of success" on the claim, as that would be "unduly onerous."[355] "Although framed as a substantial likelihood of liability, the standard [] only requires that [P]laintiffs make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[356]

Five members of the Demand Board were not on the CBS Board at the time of the Merger and therefore face no prospect of liability in this case. The remaining eight members of the Demand Board served on the CBS Board at the time of the Merger and are alleged to have engaged in wrongdoing. Those individuals are: Beinecke, Byrne, Goldner, Griego, Schuman, Terrell, Klieger and Ms. Redstone.

CBS's certificate of incorporation exculpated directors from personal liability to the fullest extent permitted by Delaware law.[357] Thus, Plaintiffs must "plead a non-exculpated claim against each director [except Ms. Redstone] who moves for

---

[355] *Rales*, 634 A.2d at 934–35.

[356] *Zuckerberg*, 2020 WL 6266162, at *16 (internal quotations omitted).

[357] ViacomCBS Opening Br. Ex. 2 (CBS Am. and Restated Certificate of Incorporate) at Article VII(1). The Court may "take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings." *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000).

dismissal."[358]  In this context, the inquiry is informed by the standard of review but ultimately focuses on the more basic question of whether Plaintiffs have pled a non-exculpated claim—that the Director Defendants breached their duty of loyalty in connection with the Merger.[359]  Even in the face of an exculpatory charter provision, "when a complaint pleads facts creating an inference that seemingly independent directors approved a conflicted transaction for improper reasons, and thus, those directors may have breached their duty of loyalty, the pro-plaintiff inferences that

---

[358] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015) (citations omitted).  The claims against Ms. Redstone, as CBS's controlling stockholder, would not be subject to exculpation.  *See* 8 *Del. C.* § 102(b)(7) (providing that exculpation would apply to a stockholder who served as a director only for claims of "breach of fiduciary duty as a director").

[359] *See Baiera*, 119 A.3d at 62–63 (noting that where the corporation's "charter includes an exculpatory provision . . . a substantial likelihood of liability 'may be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts'"); *Zuckerberg*, 2020 WL 6266162, at *17 (observing that, after *Cornerstone*, "the fact that entire fairness may govern the underlying claim does not give rise to substantial likelihood of liability for purposes of considering a demand *unless* the complaint pleads facts sufficient to raise a reasonable doubt that the director would not be entitled to exculpation"); *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *10 (Del. Ch. Mar. 19, 2018) (holding that a plaintiff must well plead a breach of the duty of loyalty to meet the substantial likelihood of liability standard under *Rales* in the face of an exculpatory charter provision).  This focus on the nature of the claim rather than on standard of review recognizes that claims may be subject to exculpation or shifting standards of review (*e.g. MFW*) under certain circumstances.  *See Zuckerberg*, 2020 WL 6266162, at *17.

must be drawn on a motion to dismiss counsels for resolution of that question of fact only after discovery."[360]

When analyzing the viability of breach of fiduciary duty claims at the pleading stage, the court frequently begins by tackling the gating question: by what standard of review will the court *likely adjudicate* the claim?[361] As noted, in the wake of *Cornerstone*, the answer to this question does not, *per se*, also answer the *Rales* "substantial likelihood of liability" question, but the court "must" take the "standard of review . . . into account when assessing whether a substantial likelihood of liability exists."[362] As I address the breach of fiduciary duty claim against each Defendant, therefore, I begin with the standard of review. As is often the case, this analysis foretells the answer to the substantial likelihood of liability question.

---

[360] *Cornerstone*, 115 A.3d at 1186.

[361] *See Tornetta v. Musk*, 2019 WL 4566943, at *1 (Del. Ch. Sept. 20, 2019) (noting that the standard of review presents a gating question when confronting pleading stage challenges to breach of fiduciary duty claims); *Zuckerberg*, 2020 WL 6266162, at *16–22 (instructing that, when evaluating a director's substantial likelihood of liability under *Rales*, "if the underlying claim is for breach of fiduciary duty, then the court must determine what standard of review would apply to that claim and take that standard into account when assessing whether a substantial likelihood of liability exists"). I say "*likely adjudicate*" recognizing that the standard of review is not fixed for all time in the litigation by a pleading stage determination; facts may be developed in discovery that justify a different standard of review. *See Orman*, 794 A.2d at 31.

[362] *Zuckerberg*, 2020 WL 6266162, at *16–22.

While each Count rests on a smilar set of predicate facts, the claims against each Defendant draws on different legal precepts. In the analysis that follows, I address the claims against each of the members of the Demand Board separately, divided between Merger-related and Ianniello compensation-related claims, to determine whether Plaintiffs have pled with particularity that these Defendants face a substantial likelihood of liability under *Rales.* I then address the ramifications of those determinations on demand futility with respect to each of the derivative claims.

### a. The Merger-Related Claims (Counts I–IV)

Counts I through IV of the Complaint relate to the Merger. To reiterate briefly, Count I asserts a derivative claim for breach of fiduciary duty against the NAI Parties for disloyally engineering the Merger in a conflicted transaction that violated the 2018 Settlement and from which they extracted non-ratable benefits. Count II asserts a derivative claim for breach of fiduciary duty against the CBS Committee and Ianniello for disloyally approving the unfair Merger at Ms. Redstone's behest. Count III asserts a direct claim (reviewed here as if derivative) against Ms. Redstone and the NAI Parties for breaching their fiduciary duty of loyalty by forcing former CBS Class B stockholders to enter into a Merger that effectively caused CBS stockholders to transfer (or sell) their CBS stock in exchange for stock of a new and less valuable company, resulting in both diluted ownership stakes and diluted value. And Count IV asserts an individual and class claim

93

(reviewed here as if derivative) against Ms. Redstone, the Director Defendants and Ianniello for breaching their fiduciary duties by allowing Ianniello to negotiate the Merger he already signaled he was willing to force CBS to pursue, failing to advocate for the interests of CBS and its public stockholders, and also by allowing Ms. Redstone improperly to influence the Merger negotiations and cause CBS to enter into the patently unfair Merger to the detriment of CBS's public stockholders.[363]

### i. The Claims Against the NAI Parties

Delaware's default standard of review is the business judgment rule, which "presum[es] that in making a business decision, [a corporate fiduciary] acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."[364] Plaintiffs bear the burden, including in their pleading, of rebutting that presumption.[365]

Because a controlling stockholder "occupies a uniquely advantageous position for extracting differential benefits from the corporation at the expense of

---

[363] Compl. ¶¶ 249–57.

[364] *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *26 (Del. Ch. July 24, 2014) (noting that plaintiff had pled sufficient facts to rebut the business judgment rule presumption).

[365] *Id.*

minority stockholders," our law has long recognized that it is right to impose upon the controller the fiduciary duty of loyalty and good faith running to the corporation and its other stockholders.[366] Not unique to controllers, the duty of loyalty "requires an undivided and unselfish loyalty to the corporation" and "demands that there shall be no conflict between loyalty and self-interest."[367]

As a general matter, under our law, a controller engages in a "conflicted transaction" when (1) "the controller stands on both sides [of a transaction]"; or (2) "the controller competes with the common stockholders for consideration."[368] The controller will be deemed to "compete with common stockholders for consideration" when the controller (1) "receives greater monetary consideration for its shares than the minority stockholders"; (2) "takes a different form of consideration than the minority stockholders"; or (3) "gets a unique benefit by extracting something uniquely valuable to the controller, even if the controller

---

[366] *EZcorp*, 2016 WL 301245, at \*11 (citation omitted).

[367] *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).

[368] *Id.*; *Larkin v. Shah*, 2016 WL 4485447, at \*8 (Del. Ch. Aug. 25, 2016) ("Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary), as well as those in which the controller stands on only one side of the deal but 'competes with the common stockholders for consideration.'").

nominally receives the same consideration as all other stockholders."[369]  Under any of these scenarios, the controller's conduct will be subjected to entire fairness review, "the highest standard of review in corporate law."[370]  In the merger context, where the controller engages in a conflicted transaction, entire fairness applies "as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller."[371]

The parties here agree on three basic facts pertaining to the NAI Parties' relationship to the Merger.  First, the NAI Parties controlled both Viacom and CBS, holding slightly more than 80% of the voting power in each entity.  Second, NAI "stood on both sides" of the Merger.  Third, the CBS Board did not anchor their process in the safe harbor established in the seminal *MFW* decision.[372]  The parties

---

[369] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (internal quotations omitted).

[370] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014).

[371] *Id.*

[372] Compl. ¶¶ 111, 134, 157; 220 Op. at *6 (noting that the Merger did not "follow the *MFW* roadmap"); *see MFW*, 88 A.3d at 644; *Tornetta*, 2019 WL 4566943, at *12 ("*MFW* provides a roadmap that allows fiduciaries to engage in conflicted controller transactions worthy of pleadings stage business judgment deference. In the conflicted controller context, in particular, *MFW*'s 'dual protections' are meant to 'neutralize' the conflicted controller's 'presumptively coercive influence' so that judicial second-guessing is no longer required." (quoting *In re Rouse Prop., Inc.*, 2018 WL 1226015, at *1 (Del. Ch.

fundamentally disagree, however, regarding the implication of these undisputed facts on the standard review.

Plaintiffs argue that, because the NAI Parties stood on both sides of the Merger, and elected not to trigger the *MFW* safe harbor, entire fairness should apply as the operative standard of review come what may.[373] Defendants disagree with the fundamental premise of Plaintiffs' argument—i.e., that Delaware law requires entire fairness review any time a controlling stockholder stands on both sides of a transaction—and argue that the Merger's *pro rata* treatment of minority stockholders allows the business judgment rule to remain as the standard of review.[374] According to Defendants, in a case like this, where the controller has an

---

Mar. 9, 2018) (citing *Kahn*, 88 A.3d at 644))). While the CBS Board created and deployed a special committee with respect to the Merger, "[b]ecause the controller's influence operates at both the board and stockholder levels, neither a special committee nor a majority-of-the-minority vote, standing alone, is sufficient to sterilize the controller's influence and reestablish the presence of a qualified decision maker." J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1461 (2014).

[373] *See* Pls.' Answering Br. at 40 ("That the presence of a controller on both sides of the transaction—***standing alone***—triggers entire fairness review has been a precept of Delaware corporate law for nearly forty years.") (emphasis in original).

[374] *See In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1024 (Del. Ch. Aug. 17, 2012) ("[P]ro rata treatment remains a form of safe harbor under [Delaware] law."); *see also In re BHC Commc'ns, Inc. S'holder Litig.*, 789 A.2d 1, 11 (Del. Ch. 2001) (explaining the mere fact that controlling stockholder proposed transaction or participated in negotiations "could not ordinarily support a claim of breach of fiduciary duty against it unless there were well-pleaded allegations that it had an interest in the transaction that differed from that of the other stockholders and exercised its control over the approval of the transaction");

essentially equal economic stake in the two companies to be combined, there is no incentive for the controller to favor itself at the minority's expense.

As in *Viacom*, both parties claim "settled" Delaware law supports their position.[375] And, as in *Viacom*, while tempting, I need not decide which party has the better of the "settled" law on their side, or even if the law on the point is settled at all.[376] This is because, as in *Viacom*, in addition to the NAI Parties' "presence" on both sides of the Merger, other facts, as particularly alleged in the Complaint, reveal that the Merger was a "conflicted controller" transaction.[377]

*First*, as bulleted below, Plaintiffs allege with particularity that Ms. Redstone engineered the Merger to bail out Viacom for the benefit of NAI, and thereby extracted a non-ratable benefit from the transaction:[378]

---

*Crimson*, 2014 WL 5449419, at *12 ("Entire fairness review is not triggered solely because a company has a controlling stockholder. The controller must also engage in a conflicted transaction."); *Voigt*, 2020 WL 614999, at *23 (same).

[375] *In re Viacom, Inc. S'holders Litig.*, 2020 WL 7711128, at *3 (observing that the parties' fundamental disagreement over the supposedly "settled" state of Delaware law on the extent to which a controller's "mere presence" on both sides of a transaction, alone, was sufficient to create a conflict that would justify entire fairness review was "interesting").

[376] *Id.* at *13–16 (taking up the "mere presence debate" but ultimately concluding that a definitive ruling on the question was unnecessary since the plaintiffs had well-pled other bases to conclude that the transaction was conceivably conflicted).

[377] *Crimson*, 2014 WL 5449419, at *12.

[378] This court has recognized that the "bailout" scenario is a transactional paradigm that presents a conflict of interest for the controller. *See, e.g.*, *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *2 (Del. Ch. Mar. 18, 2018) ("*Tesla I*") (involving a controller

- Communications from Ms. Redstone indicate she worried Viacom was "tanking" and that "time ha[d] run out" for Viacom.[379] If Viacom could not be rescued, Ms. Redstone's substantial investment in Viacom would be squandered.[380]

- Viacom's business model relied on outdated content and technology, "saddled with cable channels with dimming prospects, diminishing brands and franchises, difficult negotiations with pay-TV distributors because of its sinking ratings, and a [] focus[] on aging technology while consumers instead 'cut' their tie to cable companies, focusing on streaming through the internet instead."[381] Plaintiffs allege, "[t]his was one of the primary reasons CBS resisted a merger in 2018: it did not wish to have to try to repair a faltering business, particularly during a time in which it would increasingly need to focus on cutting-edge technology and new content."[382]

- Ms. Redstone was exploring a sale of NAI,[383] was advised of the "risk" that Viacom would be unsellable, and was told that NAI would end up owning only an "orphaned" Viacom were NAI to put both Viacom and CBS up for sale.[384]

- Ms. Redstone was advised that "[t]he ideal scenario for [NAI] may be a combination of [CBS] and [Viacom] as a first step, followed by a sale of

---

allegedly causing one controlled company to "bailout" another controlled company at an unfair price); *In re BGC P'rs, Inc.*, 2019 WL 4745121 (Del. Ch. Sept. 30, 2019) (same); *In re Southern Peru Copper Corp. S'holder Deriv. Litig.,* 52 A.3d 761, 787 (Del. Ch. 2011), *aff'd sub. nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012) (same).

[379] Compl. ¶ 56.

[380] Compl. ¶¶ 55, 224.

[381] Compl. ¶ 182.

[382] *Id.*

[383] Compl. ¶ 158.

[384] Compl. ¶¶ 158, 224.

[NAI]," and her son agreed that "selling NAI [after the Merger] would be ideal."[385]

- Apparently acting on her stated concerns, and the recommendations of her advisors, Ms. Redstone attempted in 2016 and 2018 to merge Viacom and CBS. Both attempts were rejected by the CBS Board, with the final attempt culminating in the CBS Board attempting to dilute Ms. Redstone's control with a dividend.[386] The CBS Board's action was motivated by their belief that NAI and Ms. Redstone "present[ed] a significant threat of irreparable and irreversible harm to the Company and its stockholders" because she was seeking "to combine CBS and Viacom regardless of the strategic and economic merits of the transaction."[387]

- The Merger was not the product of organic acquisitive interest on the part of the CBS Board; rather, it was initiated by Ms. Redstone at a time when she was contractually prohibited from doing so at a meeting she was contractually barred from attending.[388]

- Beinecke and Minow took Ms. Redstone's demands to the full CBS Board without disclosing what took place at the February 22 N&G Committee meeting attended by Ms. Redstone.[389]

- Viacom's performance was declining and neither the market nor most of the analysts that covered the stock viewed the Merger as value-accretive

---

[385] Compl. ¶ 158.

[386] NAI contends that the 2018 merger discussions broke down over a disagreement concerning governance and management of the combined company (triggered by CBS's former CEO, who resigned well before discussions). *See* NAI Opening Br. at 49. But this contradicts the well pled allegations in the Complaint, which this Court must regard as true at this stage of the proceedings. *See* Compl. ¶¶ 66–71.

[387] Compl. ¶ 67–68.

[388] Compl. ¶¶ 95, 97, 100.

[389] *Id.*

for CBS.[390] As one analyst put it: "[I]t's not clear what this deal does for [CBS] shareholders beyond NAI[,] synergies at $500mm are probably not much larger than transaction fees. . . . To us, this deal is mostly about [NAI] consolidating its control. . . . We think the real winner is NAI."[391]

Defendants are right to argue that some of these facts, standing alone, make for a leaky vessel in which to float a bailout claim, even at the pleading stage. Together, however, Plaintiffs' particularized allegations allow a reasonable inference that Ms. Redstone derived a non-ratable benefit from the Merger by using CBS to bail out the NAI Parties' separate investment in Viacom. Though Ms. Redstone's concern for Viacom's viability date back to 2016, Plaintiffs well plead that Viacom's financial situation had not materially improved in the interim.[392] And advisors' warnings, paired with Ms. Redstone's actions, reveal that her concern for Viacom persisted, as she remained committed to a Viacom bail-out by CBS with the assistance of an allegedly ineffective special committee, as discussed below, and without the approval of CBS's minority stockholders. A sinking ship remains a sinking ship, regardless of its proximity (spatial or temporal) from rock-bottom; and

---

[390] Compl. ¶¶ 175–76.

[391] Compl. ¶ 176 (quoting *ViacomCBS – What's Love Got to Do With It?*, Wells Fargo Securities Equity Research, Sept. 23, 2019 at 1–2).

[392] Compl. ¶ 67 (citing CBS 00005143); *see also id.* at ¶ 104.

Plaintiffs have satisfactorily pled Ms. Redstone believed Viacom needed to be rescued at the time of the Merger.

*Second*, and relatedly, Plaintiffs have alleged with particularity that the Merger represented a means by which Ms. Redstone extracted the non-ratable benefit of enhancing NAI's value in preparation for its future sale.[393] In other words, Plaintiffs' particularized allegations allow a reasonable inference that CBS's acquisition of Viacom was motivated not only by Ms. Redstone's concerns about Viacom's viability as a going concern, but also her desire to shop NAI following their consolidation.

On this theory of non-ratable benefit, *IRA Trust FBO Bobbie Ahmed v. Crane* is instructive.[394] There, a controller was alleged to have engaged in a recapitalization to perpetuate control in future transactions.[395] While the controller did not derive a non-ratable benefit from the recapitalization itself, the court found it reasonably conceivable that a non-ratable benefit was extracted nonetheless because the complaint alleged the recapitalization was motivated to allow the controller to

---

[393] Compl. ¶¶ 5, 158–61, 243.

[394] 2017 WL 7053964 (Del. Ch. Dec. 11, 2017).

[395] *Id.*

perpetuate its control in future transactions.[396] In other words, the court did not blind itself to credible, well-pled allegations of a non-ratable benefit accruing to a controller in a transaction, even though the transaction appeared superficially to treat all stockholders equally.

Plaintiffs' allegations describe in much the same way how Ms. Redstone's actions were motivated to enhance the value of NAI to the detriment of other CBS stockholders. Ms. Redstone refused to consider an acquirer's interest in CBS if it did not also "include Viacom."[397] Ms. Redstone's son admitted to Klieger that Ms. Redstone believed "selling NAI would be ideal."[398] And the second merger attempt was initiated directly after the NAI Parties were advised that "a sale of [NAI]" was preferable to a sale of either or both of CBS and Viacom, concluding that "[t]he ideal scenario for [NAI] may be a combination of [CBS] and [Viacom] as a first step, followed by a sale of [NAI]."[399] These facts, pled with particularity, allow a reasonable inference that the NAI Parties extracted a non-ratable benefit by

---

[396] *Id.*

[397] Compl. ¶ 59.

[398] Compl. ¶ 158 (quoting CBS 00004137).

[399] Compl. ¶ 58 (quoting CBS 00004219).

enhancing the value of NAI to the detriment of CBS.[400]  Thus, the claims in Counts I

and III stated against the NAI Parties are subject to entire fairness review, with the

burden of persuasion resting on the Defendants.[401]

As this court has noted, at the pleading stage, "[t]he possibility that the entire

fairness standard of review may apply tends to preclude the Court from granting"

dispositive relief on the pleadings.[402]  As discussed below, this case is no exception

as I find Plaintiffs have well pled facts that support a reasonable inference the Merger

was not entirely fair to CBS.  They have also pled with particularity facts that allow

---

[400] I note that my decision here rests on unique facts as pled in this Complaint.  The mere fact a controller's holding company will benefit from synergies flowing from a combination of two of its companies does not necessarily mean that the acquiror obtained a non-ratable benefit that would justify entire fairness review; such a broad reading of this decision or *IRA Trust* would have inordinate and unintended consequences on M&A by, for example, reflexively subjecting transactions among private equity portfolio companies to entire fairness review at the pleading stage.  Here, Plaintiffs have pled with particularity that the controller was able and willing to pursue a transaction to the detriment of CBS stockholders because she was contemplating a near-term sale of NAI.

[401] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction . . . bears the burden of proving entire fairness.").  As explained below, because Plaintiffs have raised *bona fide* questions regarding the effectiveness of the CBS Committee, there is, for now, no basis to assume that burden shifting is appropriate. *Id.* at 1120–21 (noting that either an effective independent committee or majority of the minority vote condition in connection with a controlling stockholder transaction will justify switching the entire fairness burden from defendant to plaintiff).

[402] *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018); *see also Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *15 (Del. Ch. July 26, 2018) (same).

the Court to conclude that the NAI Parties face a substantial likelihood of liability with respect to the putative derivative claims asserted against them in the Complaint.

### ii. The Claims Against Other Members of the Demand Board

Having determined that the claims against the controller will be subject to entire fairness review, intuitively, one might conclude that the claims against the Director Defendants should be subject to the same standard of review, particularly since the gravamen of the allegations against the NAI Parties is that Ms. Redstone dominated the CBS Board to achieve her personal objectives.[403]  But that is not how our law works.  As our Supreme Court made clear in *Cornerstone*, entire fairness review for one does not mean entire fairness review for all:

> [T]o require independent directors to remain defendants solely because the plaintiffs stated a non-exculpated claim against the controller and its affiliates would be inconsistent with Delaware law and would also increase costs for disinterested directors, corporations, and stockholders, without providing a corresponding benefit.  First, this Court and the Court of Chancery have emphasized that each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action.  And under Delaware corporate law, that individualized consideration does not start with the assumption that each director was disloyal; rather, independent directors are presumed to be motivated to do their duty with fidelity . . . .  This Court has [] refused to presume that an independent director is not entitled to the protection of the business judgment rule

---

[403] *See, e.g.*, *In re Radiology Assoc., Inc. Litig.*, 1990 WL 67839, at *8 (Del. Ch. May 16, 1990) (noting that all defendants, controlling stockholders and directors alike, had conceded that the entire fairness standard of review applied to all claims of breach of fiduciary duty arising out of a cash-out merger initiated by a controlling stockholder).

solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the transaction was not entirely fair to the minority stockholders.[404]

This is particularly important when breach of fiduciary claims against board members, like the clams against the CBS Committee members, must be reconciled with the corporation's Section 102(b)(7) charter provision.[405] Under these circumstances, a separate, start-from-scratch review of the allegations against the Director Defendants is necessary. Even so, as explained below, the Complaint well-pleads that the CBS Committee members—Beinecke, Byrne, Countryman, Goldner, Griego, Minow, Schuman and Terrell—breached their fiduciary duty of loyalty by favoring NAI's interests over those of CBS's minority stockholders. Entire fairness review, therefore, is triggered as to the claims against these defendants.

As an initial matter, while it is certainly the case that the claims against the Director Defendants (including the CBS Committee members) must be analyzed separately from those asserted against the NAI Parties, the Court cannot ignore the role of the controller in evaluating the loyalty of the Director Defendants with respect to the Merger, as alleged in the Complaint. And, here again, the lodestar is conflict.

---

[404] *Cornerstone*, 115 A.3d at 1182–83 (internal quotations omitted).

[405] *See id.* at 1185 ("Establishing a rule that all directors must remain as parties in litigation involving a transaction with a controlling stockholder would thus reduce the benefits that the General Assembly anticipated in adopting Section 102(b)(7).").

While courts and commentators have aptly referred to the coercive controller as the "800-pound gorilla,"[406] or the "king or queen" of the company,[407] the reality is that controllers come in different forms depending, in large measure, upon the extent to, and purpose for, which they exert their influence.[408] Delaware law attempts to account for some of this nuance by, for example, considering a controller's demonstrated "retributive capacities,"[409] the extent to which a minority stockholder can control the informational environment in which the board operates,[410] and the

---

[406] *In re Pure Res., Inc. S'holders Litig.,* 808 A.2d 421, 436 (Del. Ch. 2002); Leo E. Strine, *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 509 (2002).

[407] Zohar Goshen & Assaf Hamdani, *Corporate Control and Idiosyncratic Vision*, 125 Yale L.J. 506, 509 (2016).

[408] *See generally* Ann M. Lipton, *After* Corwin: *Down the Controlling Shareholder Rabbit Hole*, 72 Vand. L. Rev. 1977 (2019) (thoroughly analyzing the doctrinal development of Delaware's controlling stockholder jurisprudence and describing generally the various factors that might influence the controller to exercise his control).

[409] *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *6 (Del. Ch. Feb. 4, 2020) ("*Tesla II*") (citing *Pure Res.*, 808 A.2d at 436); *see also EZcorp*, 2016 WL 301245, at *41–42 ("[G]iving pleading-stage effect to a controller's actual threats and retributive behavior has important integrity-preserving consequences. If a controller anticipates that threats will have legal consequences for demand futility and other doctrines, then he should be less likely to make and carry them out.").

[410] *See, e.g.*, *FrontFour Capital Gp. LLC v. Taube*, 2019 WL 1313408, at *22–23 (Del. Ch. Mar. 22, 2019) (finding entire fairness applied to transactions involving an alleged control group, in part, based on the well-pled fact that the controller directed the flow of information regarding the transactions).

controller's ability and propensity to exploit his influence to tunnel corporate benefits (and behavior) in a desired direction.[411]

The nuance takes on added layers in companies operating with a dual-class common stock structure, whereby economic and voting rights are bifurcated and the controllers are more aptly described as "small-minority controllers" in recognition of their outsized voting power when compared to their minimal stake of equity capital.[412] The juxtaposition of Sumner Redstone and Ms. Redstone provides a case in point. Both held identical degrees of control over CBS and Viacom when they controlled NAI, but each exercised that control in opposite ways. As alleged, Sumner Redstone's statements and actions reflect a controller dedicated to independent corporate governance;[413] Ms. Redstone's alleged statements and

---

[411] *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *1 (Del. Ch. July 6, 2018) (deemphasizing voting percentage in the controller inquiry in view of other factors).

[412] *See* Lucian A. Bebchuk & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 Geo. L.J. 1453, 1456–1514 (2019) (highlighting the governance and policy risks of dual-class structures and providing empirical evidence regarding various mechanisms by which "small minority control" is perpetuated); Yu-Hsin Lin, *Controlling Controlling-Minority Shareholders: Corporate Governance and Leveraged Corporate Control*, 2 Colum. Bus. L. Rev. 453 (2017) (documenting how stock exchanges and countries around the world are grappling with dual-class common stock as control-enhancing mechanisms and observing there appears to be a race-to-the-bottom dynamic where exchanges are pressured not to exclude sales of shares from companies with dual-class voting stock to remain competitive).

[413] Compl. ¶¶ 13, 36.

actions, on the other hand, reflect a controller who will stop at nothing to achieve her personal ambitions, regardless of the consequences for the CBS stockholders to whom she owes fiduciary duties.[414] Sumner Redstone, as a self-disabled small-minority controller, would be unlikely to taint the conduct of a board of directors operating in his midst. Ms. Redstone, as the active, and at times, retributive small-minority controller, introduces the specter of coercion within the governing bodies of the compan(ies) she controls, spurred, perhaps, by the fact that her control over the companies far exceeds her financial stakes and concomitant risk.[415]

Defendants argue I should not consider allegations concerning Ms. Redstone's past behavior as she attempted to cause a Viacom/CBS merger when assessing the substantial likelihood that members of the Demand Board will face liability under *Rales*. I disagree. "[G]iving pleading-stage effect to a controller's actual threats and retributive behavior has important integrity-preserving consequences."[416] The well-documented history of Ms. Redstone's past attempts at

---

[414] *See* Compl. ¶¶ 37–49.

[415] *See In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *13 (Del. Ch. Aug. 31, 2020) (observing, "the mere presence of a controller does not trigger entire fairness *per se*[,]" but more scrutiny must be paid to transactions where the controller has, either acutely or persistently, exercised control over the decision making of other fiduciaries) (citations omitted).

[416] *EZcorp*, 2016 WL 301245, at *42.

merging Viacom with CBS regardless of the transaction's economic merit, and past boards' fervent resistance to her efforts, must color the lens through which the Court scrutinizes the faithfulness with which the CBS Board executed its fiduciary duty during the third, and successful, attempt at a merger, particularly at the pleading stage.

Delaware law has long encouraged boards to form special committees when confronted with a conflicted transaction to neutralize the influence any conflicted board members might have on the decision-making process. In general, an effective special committee should consist of independent and disinterested directors with an appropriately broad mandate from the full board. Indeed, in the context of a transaction with a controlling stockholder, "the special committee must have real bargaining power that it can exercise with the majority stockholder on an arm['s-]length basis."[417] It should also have its own legal and financial advisors who themselves are free from the influence of any interested board members. Even when the special committee has independent legal and financial advisors and negotiates diligently, however, our Supreme Court has recognized that the requisite degree of fiduciary independence may nevertheless be found lacking if the committee and

---

[417] *Lynch*, 638 A.2d at 1115.

110

controller fail, at least, to attempt to ensure that the committee is empowered to negotiate free of outside influence.[418]

After the 2018 Settlement, the Complaint recounts with particularized factual allegations how each member of the CBS Committee acceded to Ms. Redstone's will in breach of their non-exculpated fiduciary duty of loyalty. The defects in the CBS Committee's process began before its inception. Notwithstanding the "cooling off" period contemplated by the 2018 Settlement, on January 31, 2019, the CBS Board heard from representatives of Centerview and Lazard regarding "their views on strategic alternatives available to the Company."[419] Just over a week later, Zelnick e-mailed Ms. Redstone and Pruzan—the co-founder of Centerview—to encourage them "to connect"; the pair agreed to speak on February 11.[420] On February 16, 2019, Ms. Redstone was asked at a staged Viacom virtual town hall by Bakish, Viacom's CEO, about a Viacom/CBS merger.[421] Having recently been in contact with the CBS Board's strategic advisor, Ms. Redstone responded that "scale

---

[418] *Id.*

[419] Compl. ¶ 87.

[420] Compl. ¶ 88 (citing CBS 00006244).

[421] Compl. ¶ 89.

matters" and Viacom "will look for transactions to accelerate [its] strategy."[422] Five days later, on February 21, 2019, a group of CBS Committee members (but not the entire committee) met again with Centerview and Lazard to review strategic acquisition opportunities.[423] The advisors presented these members of the CBS Committee with Viacom's financial metrics, which included flat revenue and declining operating income.[424] At this point, it appeared that CBS was not yet sold on the prospect of acquiring Viacom, as there were no firm plans in place to proceed with any exploration of a transaction.[425]

The very next day, on February 22, 2019, Ms. Redstone "crashed" an N&G Committee meeting chaired by Beinecke, with Minow in attendance.[426] Zelnick, who had just opened the backchannel between Ms. Redstone and Centerview, "did not participate" for reasons undisclosed.[427] At that meeting, notwithstanding the prohibition in the 2018 Settlement, Ms. Redstone asked that Centerview and Lazard

---

[422] *Id.*

[423] Compl. ¶ 90.

[424] *Id.*

[425] Compl. ¶ 91.

[426] Compl. ¶¶ 93, 208.

[427] Compl. ¶¶ 93–94.

be invited to return so they could "continue more detailed discussions with the independent directors regarding strategic possibilities for [CBS]."[428]

While Defendants derisively characterize Plaintiffs' allegations regarding Ms. Redstone's demand for the formation of a special committee as "bare speculation," the meeting's minutes show that "discussion continued" after Ms. Redstone left, leading to the recommendation that the CBS Board form a special committee.[429] The "continu[ation]" of discussions implies that discussions had begun while Ms. Redstone was at the meeting. And Tu, CBS's then-Chief Legal Officer, who had attended the meeting and was well aware of the 2018 Settlement conditions, abruptly resigned the same day for "Good Reason," which, according to his employment agreement, is triggered when he is assigned "duties or responsibilities . . . materially inconsistent with [his] position, titles, offices or reporting relationships . . . or that materially impair [his] ability to function as Senior Executive Vice President and Chief Legal Officer of CBS."[430] Plaintiffs' allegations thus allow a reasonable inference that Ms. Redstone initiated CBS's pursuit of the

---

[428] Compl. ¶ 95 (citing CBS 00002036).

[429] *Id.*

[430] Compl. ¶ 98.

Merger at the February 22, 2019 N&G meeting she attended without invitation, notwithstanding the 2018 Settlement, which prohibited her from so doing.

Beinecke, as Chair of the N&G Committee, also fully aware of the 2018 Settlement, faithfully acceded to Ms. Redstone's demands by calling for a special committee.[431]  Indeed, the process to form the committee began immediately following the February 22 N&G meeting, when an invitation was sent the next business day to the "CBS Independent Directors" for a March 9, 2019 meeting that led to the formation of the CBS Committee—a committee whose mandated focus was on a merger with Viacom.[432]  Beinecke then concealed Ms. Redstone's misconduct at the February 22 meeting from the full CBS Board.[433]  And throughout the CBS Committee's negotiations, Beinecke acted as a backchannel for Ms. Redstone despite the committee's selection of Byrne to serve as its conduit to the NAI Parties.[434]  Taken together, these allegations support a reasonable inference that

---

[431] Compl. ¶¶ 95, 97, 100.

[432] Compl. ¶¶ 99–105.

[433] Compl. ¶¶ 100, 208.  Neither the CBS Board minutes nor the Proxy disclosed Redstone's attendance at the February 22 N&G Committee meeting.  Compl. ¶¶ 95, 97, 164–65.

[434] *See* Compl. ¶¶ 95, 97, 100, 113 (citing CBS 00000068).

Beinecke acted disloyally to advance Ms. Redstone's wish to combine Viacom and CBS regardless of the transaction's merits.[435]

The Complaint then details how each CBS Committee member allowed Ms. Redstone to overcome their presumptive loyalty to CBS's other stockholders. No member objected to Ms. Redstone's role in prompting the Merger discussions notwithstanding their knowledge of the 2018 Settlement.[436] No member objected to operating under a limited mandate that forced the CBS Committee to focus *only* on a deal with Viacom.[437] No member defied Ms. Redstone's demands that the CBS Committee have no authority to declare dividends, amend the bylaws or issue any shares of capital stock—the precise tools used by the CBS Board in 2018 to defend the stockholders to whom they owed fiduciary duties from the NAI Parties' overreaching.[438] Each member also agreed to gut the CBS Committee's authority to "hir[e], select[], compensate[] or terminate[] any senior executives of the Company,"

---

[435] *See* Compl. ¶ 53.

[436] Compl. ¶ 157.

[437] Compl. ¶ 106. As the court aptly noted in *EZcorp*, "'the starting point of a decision process has a disproportionate effect on its outcome.'" 2016 WL 301245, at *40 (citing Antony Page, *Unconscious Bias and the Limits of Director Independence*, 2009 U. Ill. L. Rev. 237, 260 (2009) (quoting Samuel D. Bond et al., *Information Distortion in the Evaluation of a Single Option*, 102 Org. Behav. & Hum. Decision Processes 240, 240 (2007))).

[438] Compl. ¶ 106.

hindering their ability to bargain for key management personnel.[439]  Finally, in a move this Court has already described as "inexplicabl[e]," albeit in the context of adjudicating a Section 220 dispute, the Special Committee did not even attempt to secure a condition that the Merger be approved by CBS's unaffiliated stockholders after NAI signaled it would not agree to that condition.[440]

"[O]ur law has long inquired into the practical negotiating power given to independent directors in conflicted transactions."[441]  "Even an independent, disinterested director can be dominated in his decision-making by a controlling stockholder,"[442] resulting in directors that are "more independent in appearance than in substance."[443]  While the focus is on how the CBS Committee "actually negotiated the deal . . . rather than [on] how the committee was set up,"[444] our courts have considered the starting point from which the special committee launched their

---

[439] *Id.* (citing CBS 00001794).

[440] 220 Op. at *6; Compl. ¶ 111.

[441] *Cornerstone*, 115 A.3d at 1184.

[442] *Tesla I*, 2018 WL 1560293, at *17.

[443] *EZcorp*, 2016 WL 301245, at *21 (quoting *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (Strine, V.C.)).

[444] *Southern Peru*, 52 A.3d at 789; *see also Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997) (stating a special committee must "function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at 'an arms-length'").

negotiations when assessing the committee's adherence to its duty of loyalty amid the presence of a controller.[445]

That case law is relevant here, where the Court is evaluating whether the Director Defendants individually are substantially likely to be liable for acting disloyally by acceding to their controller's demand to approve the Merger. Their ability to negotiate against the controller is at the crux of that inquiry. By assenting to the NAI Parties' constraints on their mandate without protest, each member of the CBS Committee evidenced their inability to push back against the asserted will of the controller. This docility, in turn, forced the CBS Committee into "a world where there was only one strategic option to consider, the one proposed by the controller . . . [thus entering] a dynamic where at best it had two options[:] either figure out a way to do the deal the controller wanted or say no."[446] And, as discussed below, the NAI Parties' dominance extended to the non-CBS Committee Director Defendants as well.

---

[445] *See Southern Peru*, 52 A.3d at 787.

[446] *Southern Peru*, 52 A.3d at 763, 801. *See also Oracle*, 2018 WL 1381331, at *11 ("'The reason for the disloyalty (the faithlessness) is irrelevant[;] the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.'" (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)).

The inference of disloyalty to be drawn from each of these failures is bolstered by the fact that, in an effort to fulfill their fiduciary duties, independent CBS fiduciaries had recently and consistently worked strenuously to preserve some or all of the protections the CBS Committee brushed off when leading CBS into the Merger. Tools to preserve the CBS Committees' ability to say no, and to push back against the NAI Parties, were all the more necessary after Ms. Redstone twice reshuffled the boards of both Viacom and CBS following CBS's rejection of her past two merger attempts in efforts to secure a more favorable deck.[447] The CBS Committee's collective failure even to *ask* for any of these protections bolsters an inference that each member resigned to Ms. Redstone's will, without regard for the stockholders to whom they owed fiduciary duties.

Each of the CBS Committee members' alleged conduct during negotiations only serves to strengthen an inference of disloyalty. The Proxy and Section 220 documents indicate that each of the holdover directors not handpicked by Ms. Redstone, who only a year before had sued the NAI Parties as members of the 2018 special committee (Griego, Minow and Countryman), acquiesced to a limited role in the Merger negotiations.[448] Although they had concluded, less than a year

---

[447] Compl. ¶¶ 43, 45, 76–81.

[448] Compl. ¶ 104.

earlier, that a merger with Viacom was "not in the best interest of all the Company's stockholders" and had gone to extraordinary lengths to protect CBS from Ms. Redstone's influence, Section 220 documents show these directors did not even explain to the CBS Committee the reasons for their past fervent opposition to a Viacom/CBS merger, even though no relevant circumstances had changed.[449] As pled, their will to resist was gone.[450]

Indeed, while the passage of time may affect the advisability of a merger, Plaintiffs have pled with particularity that nothing meaningfully changed between the second and third merger attempt. In the lead-up to the second merger attempt, Viacom had significantly underperformed its fiscal year 2017 budget and a financial advisor to the then-operative CBS special committee warned that "Viacom['s] business continue[d] to suffer."[451] Centerview told CBS that, notwithstanding a perceived competitive need to scale up CBS's operations, a combined Viacom/CBS

---

[449] *Id.*

[450] Compl. ¶ 67 (citing CBS 00005143); *see also* Compl. at ¶ 104. Defendants ask for an inference that, because some board members had participated in resisting Ms. Redstone in her previous merger attempts, their loyalty cannot be questioned because they previously demonstrated their independence from her. That may be a reasonable inference, and further discovery may support it as fact. But that is not the only reasonable inference. It is also reasonable to infer, as Plaintiffs plead, that these fiduciaries' about-face signals their resignation to Ms. Redstone's will notwithstanding their fiduciary duties. At the pleading stage, Plaintiffs get the reasonable inferences, not Defendants.

[451] Compl. ¶ 64.

would "remain relatively small compared to other participants in the industry."[452] Most importantly, the 2018 CBS special committee worried about "the ability of the Company's controlling stockholder to take certain actions, particularly in light of the Company's controlling stockholder's prior actions and statements."[453] These fiduciaries worried Ms. Redstone might apply private pressure on directors, eliminate CBS management and continue to try to force a Viacom bailout.[454] With these concerns in mind, the 2018 CBS special committee ultimately declined to pursue the transaction and even sued Ms. Redstone because she was seeking "to combine CBS and Viacom regardless of the strategic and economic merits of the transaction."[455]

In 2019, Centerview again advised the CBS Committee of Viacom's floundering financial performance.[456] Ms. Redstone remained firmly in control of both companies. And, as was evidently predictable, Ms. Redstone applied pressure

---

[452] *Id.*

[453] Compl. ¶ 65.

[454] Compl. ¶ 66.

[455] Compl. ¶ 67.

[456] Compl. ¶ 87. Defendants point out that properly incorporated documents suggest the financial advisors and CBS senior management highlighted at this meeting the attractive "scale" of a combined Viacom/CBS. CBS 00001741–42. But Viacom's revenue remained flat, indicating that Centerview's previously stated concern for the relative scaled size of the combined entity should have remained unchanged. *See* Compl. ¶ 90.

through various channels to force a Viacom/CBS merger yet again, this time in breach of a binding contract between the NAI Parties and CBS.[457] By remaining silent under these unique set of facts, it is reasonable to infer that each of these directors' ostrich-politik violated their duty of loyalty.[458]

Meanwhile, the new directors handpicked by Ms. Redstone after the 2018 Settlement—Beinecke, Byrne and Terrell—were charged with interfacing with the CBS Committee's legal and financial advisors.[459] The CBS Committee designated Byrne to interface with NAI at arms-length, yet Beinecke continued his backchannel communications with Ms. Redstone.[460] Ms. Redstone made her expectations with

---

[457] *See, e.g.*, Compl. ¶ 208 (alleging that then-chair of the N&G Committee Beinecke "demonstrated her fealty to Shari Redstone by implementing Shari Redstone's demands and concealing the misconduct from the full CBS Board"); Compl. ¶ 100 ("[N]either Beinecke nor Minow reported on Shari Redstone's conduct at the February 22, 2019 N&G Committee meeting.").

[458] *Compare In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 288 (Del Ch. 2003) (holding that directors' abdication of responsibility for negotiating an employment agreement supported an inference that they violated their fiduciary duties) *with McElrath*, 224 A.3d at 993 (rejecting a loyalty claim against a board where plaintiff failed to establish the board "rubberstamp[ed] the transaction presented by [the company's] CEO [and controller]").

[459] Compl. ¶ 104.

[460] Compl. ¶¶ 117–18.

respect to the Merger known to the CBS Committee members through these conduits, and each executed faithfully on her vision.[461]

Indeed, the CBS Committee achieved almost *none* of the terms flagged by their advisors and viewed by the CBS Board mere months before as critical to any acquisition of Viacom, apparently because these priorities conflicted with Ms. Redstone's preferences. To reiterate, "Board composition" and "[c]ommittee representations" were previously flagged as key governance imperatives; yet the CBS Committee acquiesced to Ms. Redstone's demand for 13 director positions and attained only 6 positions for CBS directors, giving Viacom and NAI control of the new board and key committee assignments.[462] "Management at C-suite level" and "[k]ey operational roles" were flagged as critical management objectives; yet the CBS Committee deferred to Ms. Redstone's instruction that Viacom management should dominate the combined company and Ianniello should have only a short tenure post-merger (regardless of the substantial financial consequences of his

---

[461] The dynamic between Ms. Redstone and the CBS Committee stands in stark contrast to the dynamic at work in *Lenois v. Lewal*, where the controller attempted to create an "information vacuum" unbeknownst to the board, and the board demonstrated its independence by, *inter alia*, questioning the controller, pushing back on the transaction's speed and securing a majority-of-the-minority condition. *Lenois*, 2017 WL 5289611, at *16 (Del. Ch. Nov. 7, 2017).

[462] Compl. ¶¶ 112, 125.

122

departure).[463] "Other" key tactical issues identified were the combined company's "name / HQ / listing" and "[p]otential NAI commitments with respect to the transaction"; yet, at Ms. Redstone's insistence, the combined company showed Viacom's name first; it sold CBS's landmark headquarters ("Black Rock") in favor of Viacom's, it listed on Viacom's exchange under "VIAC"; and NAI made no meaningful commitments to refrain from dominating the combined company.[464] In sum, the Complaint well pleads each member of the CBS Committee (including those on the Demand Board) resigned to Ms. Redstone's will on nearly every point past CBS fiduciaries had flagged as critical to CBS and its stockholders.[465]

The CBS Committee's pliability may be explained, in part, by its choice of lead negotiator, Ianniello, who Plaintiffs allege steered the CBS Committee in the wrong direction as soon as the Director Defendants approved his *quid pro quo*

---

[463] Compl. ¶¶ 105, 114.

[464] Compl. ¶¶ 125, 129, 131, 148, 151.

[465] Properly incorporated documents cited by Defendants, show the CBS Committee extracted some governance protections, including preventing "(1) any change in the overall number of directors until the two-year anniversary of the Merger's closing, and (2) employment changes in connection with several executive positions, for durations ranging from fifteen months (for Mr. Ianniello) to two years post-close." Dir. Opening Br. at 17. Of course, NAI and Viacom already had majority control of the combined company's board and purported employment protections proved toothless when Ianniello was terminated less than two months after the start of his consultancy period. Compl. ¶¶ 125, 149.

compensation arrangement with Ms. Redstone. But the Director Defendants do not argue they were led blindly into the night. Nor could they be heard to do so, as they approved the Merger's terms and expressed their endorsement to the CBS stockholders and the market at large.[466]

This court will not play "Monday morning quarterback,"[467] even when an "800-pound gorilla" is suited and potentially poised to take the field of play.[468] But Plaintiffs have alleged with particularity the moves this particular controller made to influence each of the CBS Committee members and the ultimate outcome of the contest. It is further pled with particularity that these Defendants welcomed the controller, with all her self-interest, into the huddle. The extreme set of facts before the Court—the CBS Committee members' behavior that stood in stark contrast to the conduct of similarly situated fiduciaries confronting nearly identical circumstances less than a year before, combined with the documented evidence of Ms. Redstone's dogged determination to make this deal happen "one way or the other"—suffice to state with particularity that each of the CBS Committee members breached their fiduciary duty of loyalty by approving the patently unfair Merger in

---

[466] Compl. ¶ 176.

[467] *See In re Affiliated Computer Servs., Inc. S'holders Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009).

[468] *See Baiera*, 119 A.3d at 65.

order to appease Ms. Redstone.  Their actions, therefore, must be subjected to the same exacting standard as their controller: entire fairness review.

### iii. The Claims Against Ianniello

Finally, as noted, the Complaint asserts Merger-related claims against Ianniello, and it is appropriate, again, to begin the assessment of those claims with an analysis of the applicable standard of review.  Because this analysis inevitably implicates the compensation issues that are the subject of Counts V and VI discussed below, some discussion of those issues is warranted here.  The analysis of this claim also implicates the claims relating to the Merger against the members of the CBS Committee, as just analyzed.[469]

Ianniello requested to meet with Ms. Redstone in September 2018, just days after the 2018 Settlement was formally entered following the CBS Board's attempt to dilute Ms. Redstone of her voting power.[470]  The CBS Board's actions were, of course, prompted by its determination that Ms. Redstone's relentless pursuit of a

---

[469] To be clear, Ianniello is not a member of the Demand Board.  The question remains, however, whether a majority of the Demand Board could objectively consider a stockholder demand to pursue breach of fiduciary claims against Ianniello.  As discussed below, because the claims relating to Ianniello are interwined with the claims against members of the Demand Board, there is good reason to doubt the Demand Board's ability to exercise its business judgment under *Rales* with respect to a demand to pursue those claims.  To put that later analysis in context, I address the derivative claims relating to Ianniello's Merger-related conduct and compensation here.

[470] Compl. ¶ 85; *Cf.* Ianniello Opening Br. at 35–36.

Viacom/CBS merger, regardless of the transaction's merits, posed an intolerable threat to CBS and its stockholders.[471] Ianniello had thrown his weight behind the CBS Board's resistance to Ms. Redstone and evidently anticipated that his future at CBS hinged on the outcome of the 2018 litigation.[472] Ianniello's instinct on that point was well-honed, as Ms. Redstone counterclaimed in that litigation that Ianniello "knowingly breached his own fiduciary duties and knowingly and actively assisted the Director Defendants in breaching their fiduciary duties, including through his participation in and encouragement of the Director Defendants' decision to declare the extraordinary dilutive dividend."[473]

On the heels of the settlement of Ms. Redstone's claim against him, with the 2018 Settlement's reshuffling of the CBS Board front and center, Ianniello advised Ms. Redstone during their September 2018 meeting that he now understood the merits of a Viacom/CBS combination.[474] Ianniello's conversion from apostate to apostle with respect to a Viacom/CBS merger apparently prompted Ms. Redstone's

---

[471] *See* Compl. ¶ 67.

[472] Compl. ¶ 73 (documenting then-CBS CEO Moonves discussing with Ianniello the plan to dilute NAI's stake, and Ianniello responding that he had Moonves' back "to the end." (quoting CBS 00004048–49)).

[473] Compl. ¶ 73 (quoting CBS 00004073).

[474] Compl. ¶ 85.

own epiphany; although she had accused him of being a disloyal fiduciary only months before, she now believed Ianniello was worthy of substantial golden parachute compensation,[475] and thereafter made her views known during Compensation Committee meetings (which, of course, were meant to be free of NAI's influence under the 2018 Settlement)[476] where she advocated on Ianniello's behalf.[477]  Although Defendants would have the Court draw an inference that Ms. Redstone simply turned the other cheek with respect to Ianniello, that inference would stand in stark relief to Ms. Redstone's documented penchant to react strongly when corporate fiduciaries opposed her will.[478]  A *quid pro quo*, however, is a well-worn play in Ms. Redstone's playbook: Ms. Redstone paid off former Viacom CEO Dauman with $72 million in severance to settle a lawsuit prompted by her unilateral

---

[475] Ms. Redstone had questioned the original Ianniello agreement entitling Ianniello to resign with Good Reason, and to be paid $60 million, if he was not named President and/or CEO.  Compl. ¶ 74.  More specifically, Ms. Redstone questioned the validity of the golden parachute, alleging that it had not been "approved, or even discussed, by the full Board prior to the agreement being signed."  *Id.*

[476] Compl. ¶ 77.

[477] Compl. ¶¶ 86–87, 92–93.

[478] *See, e.g.*, Compl. ¶¶ 37–49 (altering the composition of Viacom's board after members supported Dauman's plan to sell Viacom's minority stake in Paramount).

replacement of six Viacom directors with her own selections shortly after seizing control of NAI and the SMR Trust.[479]

While the Compensation Committee that crafted the employment agreements (including Griego), and the CBS Board that signed off on them, knew Ms. Redstone would never allow Ianniello to continue in his role at CBS,[480] they nevertheless changed his compensation package in the Second Ianniello Amendment in at least four ways. First, Ianniello received more cash. His base salary increased from $2.5 million to $3 million and he received a guaranteed cash bonus for 2019 of $15 million (up from a potential $12 million), and an immediate lump sum payment of $5 million.[481] Second, "[t]he change to Ianniello's base salary increased his

---

[479] Compl. ¶¶ 45–48.

[480] Compl. ¶ 259. Plaintiffs' pleading as to the CBS Board's knowledge that Ianniello had no shot at becoming CEO of the combined company is supported by several alleged facts. First, the CBS Board purportedly embarked on a CEO search, but there is no evidence that it ever actually worked to locate a permanent CEO at CBS. Compl. ¶¶ 83–84. The sham CEO search process indicates the CBS Board knew it had no need to find a permanent CEO because it had resigned itself to the inevitability of the Merger, Ianniello's departure and Bakish's ultimate selection as Viacom/CBS CEO. Second, Ms. Redstone had previously voiced her opposition to Ianniello's pay even before he joined the 2018 CBS Board's attempt to dilute Ms. Redstone's voting control. Compl. at ¶ 74. Indeed, the CBS Board later acknowledged that Ms. Redstone's relationship with Ianniello made his management of the company impossible. Compl. at ¶ 114 (citing CBS 00000076). Third, Ms. Redstone's history of retributive actions taken against those who crossed her was known to the CBS Board. Compl. ¶¶ 43–46, 65, 78–80, 156 (documenting Ms. Redstone's "well-publicized" retributive actions).

[481] Compl. ¶ 108.

potential exit package in the event he did not become permanent CEO."[482]  Third, the Director Defendants broadened the scope of scenarios in which Ianniello would receive "enhanced severance," including as long as he was not named permanent CEO by December 31, 2019.[483]  Fourth, these same fiduciaries provided for additional compensation to be paid to Ianniello post-Merger, during a "Consulting Period."[484]  By providing Ianniello with enhanced compensation in the event of his inevitable post-Merger severance, Ianniello was incented to support and effectuate a Viacom/CBS merger against his prior, good faith belief that such a transaction would be harmful to CBS.

Defendants maintain there is nothing unusual about the amendments to Ianniello's employment contract, and the fact that Ms. Redstone attended Compensation Committee meetings, without more, does not support an inference that either Ms. Redstone or Ianniello breached their fiduciary duties.[485]  Indeed, Ianniello's employment agreement was going to expire on June 30, 2019, making

---

[482] Ianniello Opening Br. at 11; *see also* ViacomCBS Opening Br. at 20 n.8 ("The April 2019 amendment increased Ianniello's enhanced severance . . . .").

[483] Compl. ¶ 109.

[484] *Id.*

[485] Ianniello Opening Br. at 27–28.

the Second Ianniello Amendment necessary as a matter of course.[486]  But their argument again misconstrues Plaintiffs' claim.  Plaintiffs do not contend that Ianniello's employment contract is *per se* unlawful.  Nor do they dispute that Ianniello was likely due for a renegotiation of his employment agreement.  Rather, Plaintiffs assert that the timing of the amendments, the process that led to them and the concessions made to Ianniello, when coupled with his conduct relating to the Merger, support a reasonable inference that the NAI Parties, Ianniello and the Director Defendants breached their fiduciary duties.[487]  In other words, Plaintiffs assert the CBS fiduciaries effectively paid Ianniello for no reason other than to appease their controller, knowing this payment would secure Ianniello's support of the Merger Ms. Redstone had been doggedly pursuing for years.

The well-pled facts further demonstrate Ianniello delivered on his end of the bargain.  Despite—or rather, as Plaintiffs allege, *because of*—his conflict, Ianniello was a consistent advocate for the Viacom/CBS combination, presenting at the

---

[486] *See* Ianniello Opening Br. at 3, 11.

[487] Ianniello argues that his ownership of CBS Class B stock aligned his interests with CBS Class B stockholders.  *See* Ianniello Opening Br. at 30.  But Plaintiffs' focus is on the $70 million in severance and bonuses which, of course, are non-ratable benefits accruing only to Ianniello and large enough to incent him to compromise his other CBS-related interests.  At this stage, Ianniello has offered no basis that would allow the Court to deny Plaintiffs the reasonable inference that his contractual incentive to support the allegedly unfair merger overpowered his counteracting incentive as a stockholder to support only a fair merger.

seminal March 9 meeting "management's recommendation that [CBS] take next steps in exploring a possible combination with Viacom."[488] CBS focused on a Viacom/CBS combination thereafter.[489] He was later designated to "negotiate and complete" the Merger at the request of the CBS Committee,[490] eventually delivering for Ms. Redstone her desired corporate combination. And while Ianniello's post-Merger work as a "consultant" might have provided Defendants some factual cover to rebut Plaintiffs' *quid pro quo* theory, the Complaint pleads with particularity that Ianniello worked for less than two months post-closing before cashing out for a second time.[491] While ViacomCBS did not disclose the reason for Ianniello's abrupt departure, he was awarded compensation and benefits consistent with a "termination without cause."[492]

The temporal proximity of Ianniello's previous opposition to a merger with Viacom, his subsequent meeting with Ms. Redstone after the 2018 Settlement and Ms. Redstone's withdrawn objection to his existing compensation terms do more

---

[488] Compl. ¶ 100 (quoting CBS 00001742).

[489] Compl. ¶¶ 103–04.

[490] Compl. ¶ 105.

[491] Compl. ¶¶ 132, 149.

[492] Compl. ¶ 149.

than "raise suspicions."[493]  Ms. Redstone's newfound interest in and enthusiasm for Ianniello's compensation resulted in Ianniello first retaining and then expanding his substantial severance compensation in the event he was not named the ViacomCBS CEO.  And everyone involved knew he would not be named the ViacomCBS CEO.[494]  Both Ianniello's and Ms. Redstone's 180-degree change from their prior positions support reasonable inferences that Ianniello's enriched severance compensation was a *quid pro quo* and that he violated his fiduciary duty, with the Director Defendants' help, by giving his loyalty to Ms. Redstone in return.  As a result, Counts II and IV are, as to Ianniello, subject to entire fairness review.  And there is ample reason to doubt that the Demand Board could exercise its business judgment in deciding whether to prosecute these claims given their integral role in the alleged breaches.

### iv. The Complaint Well Pleads the Merger Was Not Entirely Fair

"The concept of fairness has two basic aspects: fair dealing and fair price."[495]  Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future

---

[493] 220 Op. at *7.

[494] Compl. ¶ 83.

[495] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[496] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[497]

As noted, overcoming entire fairness is typically a Sisyphean task for defendants at the pleading stage, where the court must accept all of Plaintiffs' well-pled facts as true and draw every reasonable inference in their favor.[498] Defendants take to the task nonetheless, relying on cases where the plaintiffs failed to allege *any* evidence of unfair process or price.[499] Like the King of Ephyra, try as they might, Defendants cannot push the boulder up the mountain because this Complaint adequately pleads both unfair price and unfair process.

As to price, Plaintiffs have alleged that past CBS boards resisted a merger with Viacom, even suing to prevent NAI from forcing a merger only months before

---

[496] *Lynch*, 638 A.2d at 1115.

[497] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citing *Weinberger*, 457 A.2d at 711).

[498] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 648 (Del. Ch. 2008).

[499] Dir. Opening Br. at 33 (citing *Monroe Cty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (dismissing complaint for failure to plead unfair price or process); *Capella Hldgs., Inc. v. Anderson*, 2015 WL 4238080, at *5 (Del. Ch. July 8, 2015) (same); *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) (same), *aff'd*, 672 A.2d 35 (Del. 1996).

negotiations for the Merger commenced, because the then-independent CBS fiduciaries knew that a Viacom/CBS combination had no strategic or economic value to offset the costs inherent in a merger.[500] Indeed, the mere potential that Ms. Redstone might cause CBS to merge with Viacom had, for years, curbed investor enthusiasm for CBS stock.[501] And the CBS Board knew that acquiring Viacom in the Merger would cause CBS's stock price to plummet because that is precisely what happened the year before when news of the renewed talks with Viacom led to an $8.7 billion loss in market capitalization.[502]

Plaintiffs further allege the CBS Committee failed to renegotiate the Merger price after Viacom announced poor results in the fourth quarter and full year ended December 31, 2019, bailing out what Ms. Redstone herself described as a "tanking" company.[503] Though Defendants make much of the fact that the Proxy states NAI declared it "was economically indifferent to the exchange ratio in the range being discussed,"[504] that statement implies NAI would *not* be indifferent if the parties

---

[500] Compl. ¶¶ 6, 150, 169–71.

[501] Compl. ¶ 175–76.

[502] Compl. ¶ 134.

[503] Compl. ¶¶ 6, 150.

[504] *See* NAI Opening Br. at 44 (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

entertained other ranges. In other words, the Complaint allows reasonable inferences that NAI had a price preference and that CBS substantially overpaid for Viacom.

Even if these allegations did not support a reasonable inference of unfair price at the pleading stage (and they do), "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[505]  "Just as a 'strong record of fair dealing can influence the fair price inquiry, . . . process can infect price.'"[506]  Thus, where it is well-pled that "the alleged defects in the negotiation process 'infected'" the transaction's price, a plaintiff "has adequately pleaded an inference of unfair price."[507]

---

[505] *Weinberger*, 457 A.2d at 711.

[506] *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *12 (Del. Ch. 2019) (quoting *Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011)).

[507] *Id.*; *see also Howland v. Kumar*, 2019 WL 2479738, at *5 (Del. Ch. June 13, 2019) ("At the pleadings stage, it is likewise reasonable to infer that the process affected the price."); *Gentile v. Rosette*, 2010 WL 2171613, at *9 (Del. Ch. May 28, 2010) ("From a tainted process, one should not be surprised if a tainted price emerges."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116 (Del. Ch. 1999) (holding defendants did not satisfy burden by showing that the price was "within the low end of the range of possible prices that might have been paid in negotiated arms-length deals" where "[t]he process was . . . anything but fair").

For reasons recounted above, the Merger's process was not fair. After Ms. Redstone catalyzed the formation of a special committee at the February 22, 2019 N&G Committee meeting, as pled, the CBS Committee acceded to her will at every turn in a sharp departure from CBS boards of the recent past. They engaged advisors who had met privately with Ms. Redstone before the special committee was formed. They accepted Ms. Redstone's request for a restricted mandate without seeking any structural mechanisms to insulate their decisions from her influence. They actively sought out and acquiesced to Ms. Redstone's demands during negotiations. Thus, it is reasonable to infer the Merger's process was not fair.

### v.    Demand is Futile as to Counts I-IV

Having determined that a majority of the Demand Board members face a substantial likelihood of liability under *Rales* for their own conduct with respect to the Merger-related claims—Ms. Redstone on Counts I, III and IV, and the members of the CBS Committee on Counts II and IV—it follows that Plaintiffs have adequately pled demand futility as to the claims stated in Counts I through IV that implicate these Defendants. While it is true the demand futility analysis "is conducted on a claim-by-claim basis,"[508] where "the factual allegations underlying [different Counts] are congruous," demand is excused as to all of those counts under

---

[508] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014).

*Rales*' substantial likelihood of liability prong.[509]  In other words, where a member of the demand board's interest extends beyond derivative claims asserted against him to claims asserted against his co-defendants, he is deemed unfit to consider a demand to pursue those claims as well.

With this in mind, I am satisfied that a majority of the Demand Board is "interested" with respect to the intertwined Merger-related claims against both the NAI Parties and all members of the CBS Committee.  They are also interested with respect to the Merger-related claims against Ianniello as those claims are "congruous" with the claims asserted against the NAI Parties and the CBS Committee members.[510]  As discussed below, this same rationale applies to the intertwined Merger-related claims asserted against the other Director Defendants as well.[511]  Thus, demand is excused with respect to *all* Merger-related derivative claims pled in Counts I through IV.

---

[509] *Chou*, 2020 WL 5028065, at \*26 (excusing demand for Counts which would require an investigation of officer breaches after the court found a majority of the director defendants substantially likely to be liable for a separate Count implicating the same set of facts).

[510] *Id.*

[511] I take up the claims against the remaining Director Defendants, Kleiger and Zelnick, separately in the Rule 12(b)(6) section of this Opinion for two reasons.  First, for reasons discussed above, a majority (7/13) of the demand board (Beinecke, Byrne, Goldner, Griego, Schuman, Terrell and Ms. Redstone) is interested under *Rales* without counting Kleiger (Zelnick is not a member of the Demand Board).  Second, Kleiger and Zelnick

### b. The Compensation-Related Claims (Counts V and VI)

Counts V and VI arise out of Ianniello's compensation arrangement, as described in detail above. Count V asserts claims against the Director Defendants and Ms. Redstone on the ground that the Ianniello compensation arrangement approved by them constitutes waste—"an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."[512] Count VI asserts that, by extension, this arrangement resulted in Ianniello's unjust enrichment because "he received an unjustified benefit at the expense of the Company."[513] I address each these claims separately below.

### i. The Claims Against Ms. Redstone

Plaintiffs name Ms. Redstone in Count V for her role in awarding Ianniello a compensation package that Plaintiffs contend constituted waste. Delaware sets a high threshold for waste, which is "extreme and rarely satisfied."[514] To constitute waste, "[t]he company would literally have to get nothing whatsoever for what it

---

abstained from voting to approve the Merger and have separately moved for dismissal under Chancery Rule 12(b)(6) on that basis, invoking the so-called abstention doctrine.

[512] *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. Oct. 28, 2015) (citations omitted).

[513] Pls.' Answering Br. at 104.

[514] *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) (citation omitted).

gave."[515]   In the context of executive compensation, "a board's decision . . . is entitled to great deference," and "large amounts of money, whether in the form of current salary or severance provisions" constitute corporate waste only where they result in "irrational[] squander[ing] or giv[ing] away corporate assets."[516] Allegations that compensation is "excessive or even lavish" are "insufficient as a matter of law."[517]

As explained, Ms. Redstone is alleged to have engineered Ianniello's compensation, assuming the role of Ianniello's advocate at Compensation Committee meetings—a committee of which she was not a member and whose meetings were, per the 2018 Settlement, to be free of her influence.[518] Her newfound interest in Ianniello's enhanced compensation marked an about-face from the position she took just prior to her September 2018 meeting with Ianniello, where the pair's *quid pro quo* arrangement was allegedly hatched.  Beyond her attendance at the relevant Compensation Committee meetings, Ms. Redstone (along with the other

---

[515] *In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *4 (Del. Ch. Oct. 25, 1999).

[516] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).

[517] *3COM*, 1999 WL 1009210, at *4–5.

[518] Compl. ¶ 77.

Director Defendants) approved the compensation package that was spawned at these meetings, a package Plaintiffs allege was wasteful.

The NAI Parties join the other Defendants in arguing the waste claim must be dismissed because Plaintiffs have not adequately pled "that CBS 'received no consideration at all' in exchange for Ianniello's compensation" when Ianniello stayed on post-Merger as a consultant.[519] According to Defendants, Ianniello's role as lead negotiator in the Merger and the purported prospect of his staying on as manager at CBS, combined with his tenure post-Merger as a consultant, reveal that CBS did receive sufficient consideration for Ianniello's pre- and post-Merger compensation to defeat Plaintiffs' waste claim.

As explained above, the particularized allegations in the Complaint support a reasonable inference that Ianniello was paid compensation not for his anticipated service to CBS but in exchange for his support of a merger he believed was bad for CBS's stockholders. Thus, to the extent Ianniello's compensation was provided for his role as negotiator during the Merger, Ianniello was not performing that work for the benefit of CBS. To the contrary, Plaintiffs well plead that Ianniello negotiated the Merger for the benefit of the NAI Parties and to the detriment of CBS. In doing

_____

[519] Independent Dir. Reply Br. in Supp. of Mot. to Dismiss ("Dir. Reply Br.") (D.I. 83) at 37 (quoting *White*, 783 A.2d at 554).

so, Ianniello's loyalties ran not to CBS but to its controller, Ms. Redstone, who desired a combination of her two companies regardless of its cost to CBS. Under these circumstances, compensation provided by CBS to Ianniello for his role as "negotiator" is, effectively, a "gift" constituting waste.

As for Ianniello's consulting period, Plaintiffs well plead that role was also known to be a fiction. While employee retention may in some cases defeat a waste claim, Plaintiffs allege that all fiduciaries involved knew that Ianniello's post-Merger work would be short-lived.[520] And that is precisely what played out; Ianniello was terminated from CBS post-Merger almost as soon as his consultancy started, entitling him to a second sizable severance.[521] The particularized facts as pled in the Complaint in support of Count V thus demonstrate that Ms. Redstone is substantially likely to be liable under *Rales* for her role in facilitating Ianniello's compensation.

### ii. The Claims Against the Director Defendants

The Director Defendants dispute Plaintiffs' waste claim for the same reasons rejected in my analysis of Ms. Redstone's liability, and that analysis applies equally here. The Director Defendants do not dispute that their role in the waste claim—

---

[520] Compl. ¶ 149.

[521] *Id.*

141

approving Ianniello's compensation package in their capacity as members of the CBS Board—is sufficient to implicate their duty of loyalty were I to find the claim well-pled. For reasons explained, I find Plaintiffs' particularized allegations allow a reasonable inference that Ianniello's compensation arrangement constituted waste. Though the CBS Board may have been unaware of the exact terms of the *quid pro quo*, they knew Ms. Redstone's newfound enthusiasm for providing Ianniello additional compensation was not grounded in his future at the combined company. They designated Ianniello to lead negotiations even as they placed before him an incentive faithfully to execute on Ms. Redstone's plan notwithstanding his duty of loyalty to CBS shareholders. Thus, Plaintiffs have well pled that the Director Defendants' approval of Ianniello's compensation expose them to a substantial likelihood of liability for waste under Count V.

### iii. The Claims Against Ianniello

For reasons already explained, Plaintiffs have pled with particularity how both Ms. Redstone and the Director Defendants face a substantial likelihood of liability under *Rales* for approving Ianniello's wasteful compensation in a *quid pro quo* arrangement. And Plaintiffs have well pled that Ianniello, for his part, accepted the wasteful compensation and, in return, delivered on his promise to execute the Merger faithfully for Ms. Redstone, in breach of his fiduciary duties to CBS stockholders. Plaintiffs have not, however, alleged that Ianniello is liable for waste under Count

V, presumably because Ianniello did not approve the wasteful compensation; he is alleged to have received it. Hence the claim against him for unjust enrichment in Count VI.[522]

According to Ianniello, the unjust enrichment claim against him cannot stand alongside the fiduciary duty-based claims because the claims are duplicative.[523] I reject that premise as applied here since this is clearly a case where the unjust enrichment claim addresses conduct separate and apart from the waste claim and the Merger-related fiduciary duty claims. As noted, the waste flows from the giving (or gifting) of unearned compensation; the unjust enrichment flows from the receiving of unearned compensation. The Merger-related claims seek damages resulting from

---

[522] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). *See also Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009) ("Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" (citation omitted)).

[523] Ianniello also makes the argument that the unjust enrichment claim is barred because his compensation was the subject of written contracts with CBS. While it is true an unjust enrichment claim will be barred when the claim is duplicative of a breach of contract claim, that general rule will not apply where, as here, the existence of the contract itself is the basis of the unjust enrichment claim. *See LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018) (acknowledging that unjust enrichment claims are often displaced by breach of contract claims, but holding that "when a plaintiff alleges that 'it is the [contract], itself, that is the unjust enrichment,' the existence of the contract does not bar the unjust enrichment claim.") (alteration in original) (quoting *McPadden*, 964 A.2d at 1276).

an unfair merger; the unjust enrichment claim seeks to recoup unearned

compensation.  While the claims may meet and overlap when the time comes to

assess a remedy, assuming all claims prevail, they do not overlap now.[524]

### iv.    Demand is Futile as to Counts V-VI

A majority of the Demand Board faces a substantial likelihood of liability on

Count V, and demand as to those claims, therefore, is futile.  Though Count VI does

not name any member of the Demand Board, a majority of the Demand Board is

---

[524] *See Frank v. Elgamal,* 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) (denying motion to dismiss an unjust enrichment claim defendants argued was duplicative of a fiduciary breach claim because "Delaware law . . . permit[s] a plaintiff to simultaneously assert two equitable claims even if they overlap.  A plaintiff will only receive, at most, one recovery, but, at least at this procedural juncture, [plaintiff] may simultaneously assert a claim for breach of fiduciary duty and a claim for unjust enrichment against the [defendants]." (citing *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010) ("In this case, then, for all practical purposes, the claims for breach of fiduciary duty and unjust enrichment are redundant.  One can imagine, however, factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims against a director."))); *see also McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008) ("[D]efendants' argument that plaintiff has conflated the unjust enrichment claim and the breach of fiduciary duty claim is unavailing.  If plaintiff has pleaded and then prevails in demonstrating that the same conduct results in both liability for breach of [defendant's] fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies.  But at this time, defendants have [] wholly failed to satisfy their burden to justify dismissal of this count."); Donald J. Wolfe, Jr & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.01[b] (2016) ("The contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.").

similarly incapable of considering a demand to prosecute that Count. Here again, the "congruity" of the compensation-related claims against Ms. Redstone, the Director Defendants and Ianniello cannot be ignored for purposes of *Rales*.[525] For his part, Ianniello acknowledges the inextricability of the fiduciary duty-based claims and unjust enrichment claim by arguing the claims are duplicative.[526] While I have rejected that argument, I do agree that the factual predicate underlying these claims—Ms. Redstone and the Director Defendant's approval of Ianniello's compensation package and his acceptance of the unearned compensation—are so intertwined as to disable a director who is substantially likely to be liable under Count V from considering a demand to prosecute Count VI. Accordingly, I am satisfied under *Rales* that Plaintiffs have pled demand futility with respect to all claims asserted in Counts V and VI.

### D. The Motions to Dismiss Under Chancery Rule 12(b)(6)

Defendants separately argue the Complaint fails to state a non-exculpated claim for which relief can be granted.[527] When considering a motion to dismiss under Chancery Rule 12(b)(6), the Court must:

---

[525] *Chou*, 2020 WL 5028065, at *26.

[526] *See* Ianniello's Reply Br. at 17–22.

[527] *See* Ct. Ch. R. 12(b)(6).

(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[528]

Dismissal is only warranted where Plaintiffs fail to plead facts supporting an element of their claim, or if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the [P]laintiffs would not be entitled to relief."[529] In opposing Defendants' dismissal motions, Plaintiffs are owed every reasonable factual inference in their favor.[530]

Of course, I have already determined that the Merger-related Counts are subject to entire fairness review and that Plaintiffs have well pled the Merger was not entirely fair. To reiterate, if "the court reviews the conduct under the entire fairness standard, the claim is likely to proceed at least through discovery, if not trial."[531] Moreover, "[t]he standard for pleading demand futility under Rule 23.1 is

---

[528] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citation omitted).

[529] *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (quotation omitted).

[530] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 n.36, 38 (Del. Ch. July 24, 2009).

[531] *Tornetta*, 2019 WL 4566943, at *1.

more stringent than the standard under Rule 12(b)(6)."[532]  "A complaint that pleads a substantial threat of liability for purposes of Rule 23.1 'will also survive a 12(b)(6) motion to dismiss.'"[533]  Because I have determined the CBS Committee members on the Demand Board face a substantial likelihood of liability on Plaintiffs' non-exculpated claims that they breached their fiduciary duty of loyalty under the more exacting Rule 23.1, it follows that the Complaint states viable claims against these directors for their role in negotiating and approving the Merger and the Second Ianniello Amendment (Counts II, IV, and V) for purposes of Chancery Rule 12(b)(6).

In brief reprise of the Rule 23.1 discussion, and to be clear, this holding extends to the CBS Board members (Minow and Countryman) who are uniquely situated in that they neither abstained from approving the Merger (both were members of the CBS Committee) nor serve on the Demand Board.  In other words, the Court's determination that a majority of the members of the Demand Board– those who served on the CBS Committee–face a substantial likelihood of liability based on pled facts extends as well to Minow and Countryman.

---

[532] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009).

[533] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013) (quoting *McPadden*, 964 A.2d at 1270).

As for the compensation-related claims, Plaintiffs allege both Minow and Countryman approved of Ianniello's compensation arrangement as members of the CBS Board in a manner and under circumstances that, for reasons already explained, rendered the compensation effectively a gift. These claims are viable as to them just as they are viable as to the other Director Defendants who serve on the Demand Board.

As for the Merger-related claims, Minow was a member of the N&G Committee and, with Beinecke, concealed from the CBS Board Ms. Redstone's conduct at that meeting where she acted in violation of the 2018 Settlement.[534] As members of the CBS Committee, both Countryman and Minow together joined Griego in the backseat as negotiations proceeded, without making any effort, as they did in the recent past, to insulate the CBS Committee from Ms. Redstone's influence or even inform the CBS Committee (comprised mainly of new directors) why they previously took drastic action to prevent a Viacom/CBS combination.[535] Along with their fellow directors on the CBS Committee, they also allowed Ms. Redstone to extract concessions flagged as key imperatives by their financial advisors. Their actions, in view of the CBS Boards' recent history with Ms. Redstone, make it

---

[534] Compl. ¶ 95.

[535] Compl. ¶ 104.

148

reasonably conceivable that they approved both Ianniello's Second Amended Employment Agreement and the Merger in breach of the duty of loyalty for all the reasons stated above. It follows that Counts II, IV and V survive all of the CBS Committee members' motions to dismiss.

Counts I and III against the NAI Parties also survive for reasons already explained. As noted, the well-pled facts make reasonably conceivable that the NAI Parties disloyally engineered the unfair Merger to bail out Viacom and better position NAI for a future sale. The Complaint proffers facts suggesting Ms. Redstone leveraged her control of the NAI Parties to catalyze and control the Merger negotiations, extracting a non-ratable benefit through a self-interested transaction at the stockholders' expense. Under these circumstances, Plaintiffs have stated a claim for breach of fiduciary duty against the NAI Parties under Counts I and III.

The foregoing discussion also provides ample bases to reject Ianniello's motion to dismiss Counts II and VI. As explained, Ianniello's assumption of a position on the Merger diametrically opposed to the one he held just prior to the 2018 Settlement, combined with Ms. Redstone's change in position on Ianniello's compensation package, combine to make reasonably conceivable the existence of a *quid pro quo* arrangement between the two. By selling his endorsement for the Merger—which Plaintiffs well plead Ianniello knew was bad for CBS

149

stockholders—Ianniello conceivably violated his fiduciary duty of loyalty. Ianniello's motion to dismiss Counts II and IV must be denied.

Not only did Ianniello's support deliver Ms. Redstone her desired merger and management team, it also resulted in his enrichment to the tune of tens of millions of dollars.[536] Less than two months after the Merger closed, Ianniello was handed millions more and told to leave for good.[537] In total, Ianniello is alleged to have received from CBS more than $125 million to garner his support for the Merger. For reasons recounted in the Court's Rule 23.1 analysis, Plaintiffs have well pled this constituted a "gift" from CBS to Ianniello for Ms. Redstone's benefit.[538] Thus, Ianniello's motion to dismiss Count VI must also be denied.

Finally, the Court must address the dismissal bids of Klieger and Zelnick, the two directors (excluding Ms. Redstone) who purportedly abstained from voting on the Merger and who have moved on that basis to dismiss Counts IV and V. As to Count V, both Klieger and Zelnick voted as members of the CBS Board to grant Ianniello increased compensation intended to garner his support for the Merger.[539]

---

[536] Compl. ¶ 265.

[537] Compl. ¶ 149.

[538] Compl. ¶ 266.

[539] Compl. ¶ 260.

I have already determined the Complaint well pleads there was no rational business justification or purpose for the amended Ianniello compensation awards. And neither Zelnick nor Klieger seriously attempt to distinguish their actions from the other directors.[540] Plaintiffs have stated a waste claim against both directors.

As for Count IV, Klieger and Zelnick each assert the so-called "abstention defense." Both did not serve as members of the CBS Committee that negotiated and approved the Merger. Thus, both argue they cannot be held liable for breaches of fiduciary duty connected to the Merger.

In support of their abstention defense, Klieger and Zelnick rely principally on *In re Tri-Star Pictures, Inc. Litigation*.[541] In *Tri-Star*, the court held that two directors could not be liable for breaches of fiduciary duty arising out of a challenged

---

[540] Klieger argues without citation that, because he was not a member of the Compensation Committee, he cannot be held liable for the compensation that the CBS Board ultimately approved. Klieger Reply Br. at 11. Of course, this argument would apply as well to the other Director Defendants who were not members of the Compensation Committee. But those defendants do not argue their disassociation from the Compensation Committee somehow absolve them of the consequences of their endorsement of Ianniello's allegedly wasteful compensation as members of the CBS Board, and for good reason. It is clear from the Complaint and otherwise that the CBS Compensation Committee "advised the Board of the key terms of [the Agreement], without objection." *See* Ianniello Opening Br. at 10 n.2; *see also* Compl. ¶¶ 108–09, 260 . For reasons already explained, Plaintiffs have well pled the entire CBS Board knew this enhanced compensation package had no rational business justification. Thus, Klieger's tacit approval of the Ianniello *quid pro quo* arrangement makes it reasonably conceivable he is liable under Count V along with the other Director Defendants and Ms. Redstone.

[541] 1995 WL 106520 (Del. Ch. Mar. 9, 1995).

transaction because neither director "attend[ed] or otherwise participate[d] in the []
board meeting[s] at which the Combination was considered and approved, and they
did not vote on that transaction."[542]  Rather, both directors "deliberately removed
themselves from the decision-making process (and also from the preparation of the
proxy materials), because they recognized . . . they had potential conflicts of
interest."[543]

While "Delaware law clearly prescribes that a director who plays *no* role in
the process of deciding whether to approve a challenged transaction cannot be held
liable on a claim that the board's decision to approve that transaction was
wrongful,"[544] this is "not an invariable rule."[545]  The "cookie-cutter step [of not
voting] is not sufficient to establish a successful abstention defense" where, for
example, "certain members of the board of directors conspire with others to
formulate a transaction that is later claimed to be wrongful."[546]  While an abstention

---

[542] *Id.* at *2.

[543] *Id.*

[544] *Id.*

[545] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007); *see also Tri-Star Pictures*, 1995 WL 106520, at *3 ("[N]o *per se* rule unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on the challenged transaction.") (emphasis in original).

[546] *Tri-Star Pictures*, 1995 WL 106520, at *3.

defense is not typically addressed at the pleadings stage,[547] a plaintiff must plead facts supporting an inference the abstaining director somehow "play[ed] a role in the negotiation, structuring, or approval of the proposal."[548]

Plaintiffs allege Zelnick played a meaningful role in facilitating the Merger despite abstaining from the vote to approve it. Specifically, it is alleged that, notwithstanding the 2018 Settlement, Zelnick opened a backchannel between Ms. Redstone and the CBS Committee's financial advisor, Pruzan, shortly after Pruzan's firm, Centerview, presented strategic alternatives to the CBS Board.[549] Ms. Redstone "publicly confirmed that the CBS-Viacom Merger was back on" days later.[550] Plaintiffs allege Zelnick then inserted himself into the Merger negotiations he had helped set in motion by presiding over early meetings of the purportedly "independent directors" who were discussing "potential strategic alternatives"

---

[547] *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 122456, at *17 (Del. Ch. Mar. 15, 2019); *see Weinberger*, 457 A.2d at 710–711 (post-trial); *Emerald P'rs*, 2001 WL 115340, at *19–20 (post-trial), *rev'd on other grounds*, 787 A.2d 85 (Del. 2001); *Tri-Star Pictures*, 1995 WL 106520, at *1 (summary judgment); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 492 (Del. Ch. 1990) (post-trial).

[548] *Valeant*, 921 A.2d at 753; *see In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *12 (Del. Ch. July 17, 2018); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *38 (Del. Ch. Apr. 14, 2017, revised Apr. 24, 2017).

[549] Compl. ¶¶ 87–88.

[550] Compl. ¶ 89.

(allegedly code for a Viacom/CBS merger)[551] and attending the meeting during which these directors turned the negotiating reins over to the conflicted Ianniello.[552] Zelnick then signed the special committee charter that constrained the CBS Committee's power to resist Ms. Redstone's undue influence.[553] And, after he purportedly stopped participating in the Merger discussions, Plaintiffs allege he continued to exert influence on the CBS Committee through Byrne.[554]

In view of these allegations, it would be premature to dismiss Count IV against Zelnick. In *Emerald Partners v. Berlin*,[555] the court (in its *post-trial* opinion) emphasized in upholding an abstention defense that "there [wa]s not *evidence* or claim that [the director] attempted to influence the views, or the vote, of any of the non-affiliated directors."[556] That is not the procedural posture in which Zelnick advances his abstention defense here. Plaintiffs do "claim" that Zelnick actively aided Ms. Redstone's intrusion into the CBS Committee's process and worked to influence the committee by communicating through Byrne. While discovery may

---

[551] Compl. ¶¶ 81, 90.

[552] Compl. ¶ 105.

[553] Compl. ¶ 106.

[554] Compl. ¶ 117.

[555] 2003 WL 21003437, at *42–43.

[556] *Id.* at *42 (emphasis supplied).

reveal that Zelnick, in fact, took no legally significant actions related to the Merger, Plaintiffs have pled facts warranting the opportunity for discovery on that claim.

Indeed, in the only case Defendants cite where a court granted a motion to dismiss on the basis of abstention, *In re Dell Technologies Inc. Class V Stockholders Litigation*,[557] the court dismissed breach of fiduciary duty claims brought against a director who abstained from participating in the negotiations that preceded a disputed stock redemption because, by the plaintiff's own allegations, the director's involvement "was limited to attending meetings of the Board, approving the issuance of the proxy materials, and approving the [transaction]."[558] Zelnick's alleged participation in the Merger was clearly more inauspicious.

As for Kleiger, at first glance, his participation in the Merger more closely resembles the conduct of the dismissed director in *Dell*. Plaintiffs allege Klieger participated in the Merger by executing a written consent to form a disempowered special committee.[559] Unlike Zelnick, Klieger is not alleged to have received and communicated backchannel directions from the controller to the CBS Committee. Nor is he alleged to have sought to influence the CBS Committee in any way.

---

[557] 2020 WL 3096748 (Del. Ch. June 11, 2020).

[558] *Id.* at *43.

[559] Compl. ¶ 106.

The only act Klieger is alleged to have undertaken related to the Merger is his vote to approve Ianniello's wasteful compensation, a vote for which he will separately be held to answer and defend.

As discussed above, however, Ianniello's compensation package was an integral part of Ms. Redstone's plan to ensure that her third attempt to cause a Viacom/CBS merger did not meet the fate of her past two attempts.[560] And, as noted, Plaintiffs well plead that the CBS Board (including Zelnick and Klieger) knew precisely what it was doing when it approved the *quid pro quo* arrangement, including that the arrangement was connected to the controller's efforts to cajole CBS fiduciaries to do what CBS fiduciaries had refused to do the year before—support the Merger.[561] Indeed, Ms. Redstone confided in Klieger that "Viacom is tanking"[562] and he was made aware of Ms. Redstone's desire ultimately to sell NAI.[563] Under these circumstances, as well pled in the Complaint, dismissal on the basis of abstention would be premature.[564]

---

[560] Compl. ¶¶ 85–87, 100.

[561] Compl. ¶¶ 43–46, 65, 78–84, 114, 156, 259.

[562] Compl. ¶ 56 (quoting CBS 00004135).

[563] Compl. ¶ 158 (citing CBS 00004137).

[564] *See In re Dairy Mart Convenience Stores, Inc. Deriv. Litig.*, 1999 WL 350473, at *1 n.2 (Del. Ch. May 24, 1999) (rejecting an abstention defense on the pleadings and holding that

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are DENIED as to Counts I, II, III, V and VI.  Defendants' Motions to Dismiss are GRANTED as to Count IV's disclosure claim, but DENIED as to the balance of the claims asserted in Count IV.

**IT IS SO ORDERED.**

---

under certain circumstances directors have an affirmative duty to attempt to prevent the board on which they serve from engaging in conduct harmful to the corporation).